NOTICE
Decision filed 12/20/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 210266-U

NO. 5-21-0266

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| *In re* B.F., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Randolph County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-JA-19 |
| | ) | |
| Kenneth F., | ) | Honorable |
| | ) | Richard A. Brown, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's findings that the respondent was an unfit person, and that termination of his parental rights was in the minor child's best interests, were not contrary to the manifest weight of the evidence.

¶ 2    The respondent, Kenneth F., is the father of B.F., born January 15, 2017. On June 30, 2021, the circuit court of Randolph County found Kenneth to be an unfit person within the meaning of the Adoption Act (750 ILCS 50/1(D) (West 2020)) for failing to make reasonable progress toward the return of the minor child during any nine-month period following the adjudication of abuse or neglect. On August 10, 2021, the circuit court found that termination of Kenneth's parental rights was in the best interests of the minor child

1

and terminated Kenneth's parental rights regarding B.F. Kenneth appeals the circuit court's judgment terminating his parental rights arguing that the circuit court's findings that Kenneth was an unfit person, and that termination of his parental rights was in the best interests of B.F., were against the manifest weight of the evidence. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4    On May 25, 2018, the Illinois Department of Children and Family Services (DCFS) opened an intact case involving B.F.'s mother.[1] At the time, mother, B.F., and B.F.'s brother, C.B., were living in the home of Kenneth's parents along with another individual, Joy F., and her child. Kenneth's parents could not be left alone with the children due to past DCFS involvement. Kenneth was also prohibited from being left alone with any children because he was under investigation for the death of his then girlfriend's child while in his care. Further, Joy F. was supposed to be working on her own issues and, therefore, was not to care for anyone else's children. Nonetheless, mother would leave B.F. and her brother in Joy F.'s care for days at a time without telling anyone she was leaving or where she was going. DCFS believed that mother was possibly using illicit drugs, and mother admitted to DCFS that she would test positive for amphetamines if tested at that time. Mother, however, failed to undergo a drug screening as directed.

¶ 5    On June 26, 2018, the State filed a juvenile petition pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq*. (West 2018)), and a shelter care hearing took

---

[1]B.F.'s biological mother was also a respondent in the circuit court proceedings but is not a party to this appeal. As such, we will only recite the facts relevant to Kenneth's challenges on appeal.

place on the same day.[2] The juvenile petition alleged that B.F. was neglected or abused as defined in section 2-3(1)(c)[3] of the Act (*id*. § 2-3(1)(c)), because (1) Kenneth was in a halfway house for substance addiction and (2) mother left B.F. for days without contact and without a responsible person caring for B.F. Kenneth was not present at the shelter care hearing. The circuit court found that DCFS had made reasonable efforts to keep the minor child in the home, but that DCFS's efforts had not eliminated the necessity for the removal of the minor child. The circuit court entered a temporary custody order pursuant to section 2-10 of the Act, placing B.F. in the temporary custody of DCFS. *Id*. § 2-10. The circuit court also appointed a guardian *ad litem* (GAL) for B.F.

¶ 6    On July 6, 2018, DCFS filed an Illinois DCFS family integrated assessment with the circuit court. In that assessment, DCFS outlined its initial assessment that Kenneth would need to obtain and maintain safe and secure housing for himself and his child. He would also need to participate in and complete mental health services and substance abuse treatment. The assessment again noted that Kenneth was under investigation regarding the death of a child and that he did not acknowledge any safety threat to B.F. The assessment also noted that Kenneth had a criminal history, and that Kenneth was unemployed and reported that he was staying in Missouri and Illinois but refused to provide an address. The assessment recommended an initial permanency goal of return home within 12 months.

---

[2]A separate juvenile petition was filed on behalf of B.F.'s brother, C.B., in case No. 18-JA-20. Kenneth is not the father of C.B.; however, the two cases proceeded jointly through the circuit court.

[3]The initial petition for adjudication of wardship incorrectly cited section 2-3(1)(c) of the Act, which was later corrected in the amended petition for adjudication, discussed later, to section 2-3(1)(b) of the Act. 705 ILCS 405/2-3(1)(b) (West 2018).

¶ 7    On September 6, 2018, the State filed an amended juvenile petition pursuant to the Act alleging that B.F. was neglected as defined in section 2-3(1)(b) of the Act (*id*. § 2-3(1)(b)) because Kenneth had a long history of substance abuse issues and domestic violence issues with B.F.'s mother. The amended juvenile petition also alleged Kenneth was under a DFCS investigation regarding the death of an infant. On September 7, 2018, the circuit court appointed counsel to represent Kenneth.

¶ 8    On September 17, 2018, the circuit court conducted an adjudicatory hearing at which Kenneth and mother were present with counsel. Mother admitted the allegations of the amended juvenile petition; however, Kenneth did not. The first witness called to testify was Robin Randall, a child protection advanced specialist with DFCS. Randall testified that she was familiar with B.F.'s case since DCFS received an investigation report on June 22, 2018. She stated that during her investigation she spoke with mother regarding the allegations. Randall further stated that she had spoken with Kenneth regarding Kenneth being under investigation of the death of a child which prevented Kenneth from being around B.F. unsupervised. Randall testified that Kenneth had a long history of substance abuse and domestic violence issues with mother. In fact, Randall testified that, "[Kenneth] told me during the time when we were looking for someone to supervise his visits with [B.F.] that he really did not feel comfortable with [mother] supervising them because of the violence that they had had." As to Kenneth's history of domestic violence with mother, Randall testified that there had been several contacts with local law enforcement being called to the home to break up fights between Kenneth and mother; however, she had no

4

knowledge of Kenneth being arrested, charges ever being filed, or convictions. Randall did admit that Kenneth was an active part of B.F.'s life.

¶ 9       At the conclusion of the hearing, the circuit court entered an adjudicatory order finding B.F. to be neglected because she was in an environment that was injurious to her welfare as defined by section 2-3(1)(b) of the Act. 705 ILCS 405/2-3(1)(b) (West 2018). The circuit court set the matter for dispositional hearing on November 29, 2018.

¶ 10      Prior to the dispositional hearing, on November 19, 2018, DCFS filed a dispositional court report prepared by Madonna Spann, a placement worker with DCFS. The report reiterated the initial allegations contained in the family integrated assessment. The report further listed the significant developments in the case since its inception. Spann noted in the report that Kenneth was uncooperative with all his services, made frequent demands and threats to investigators and supervisors, and refused all urine and hair follicle drug screens. Kenneth did sign a consent for release of information to treatment providers and was given supervised visitation with B.F. The report recommended that B.F. remain in the care and custody of DCFS, and that Kenneth be ordered to cooperate with services including assessments, therapy, and monthly hair follicle testing. In response to DCFS's request, the circuit court entered an order on November 29, 2018, ordering Kenneth to report to the Randolph County probation office for drug testing.

¶ 11      On December 13, 2018, the circuit court held a dispositional hearing. Both mother and Kenneth were present with counsel, as was the GAL. The only witness to testify was Spann. Consistent with her report, Spann testified that it was her recommendation that B.F. remain in the care and custody of DCFS. Spann stated that a service plan was in place and

given to Kenneth, and that Kenneth was visiting with B.F. Spann further testified, however, that Kenneth had not found a residence or employment and had not submitted hair follicles or urine samples for drug testing. Spann testified that she informed Kenneth that if he did not follow the terms of the service plan, he could lose his parental rights to B.F.

¶ 12    At the conclusion of the hearing, the circuit court entered a dispositional order directing that B.F. remain in the custody of DCFS with a permanency goal of return home within 12 months and set the matter for permanency review on May 23, 2019. The circuit court advised Kenneth that he must cooperate with DCFS, comply with the terms of his service plan, and correct the conditions that required the removal of the child or risk termination of his parental rights. The circuit court then strongly admonished Kenneth regarding his failure to cooperate with any services and his refusal of all urine and hair follicle drug screens, stating that Kenneth needed to cooperate with the service plan so that B.F. could be returned to him.

¶ 13    DCFS filed a permanency hearing report with the circuit court on May 10, 2019. The report indicated that Kenneth had not corrected the conditions that initially brought B.F. into care and that there had not been satisfactory progress or reasonable efforts by Kenneth towards returning B.F. home. Kenneth was rated as unsatisfactory and noncompliant on all required tasks, including obtaining a mental health assessment, obtaining a substance abuse assessment, and obtaining parenting instruction. Kenneth had failed to find and maintain safe housing, pay utilities, and submit the required documentation. The report further noted that Kenneth was rated unsatisfactory for refusing to submit a DNA sample to establish his paternity of B.F. since he had not signed a

6

voluntary acknowledgement of paternity. The report went on to indicate that B.F. was bonded with her foster family and was thriving in her current placement. Accordingly, the report recommended the permanency goal of substitute care pending court determination on termination of parental rights.

¶ 14    The circuit court conducted a permanency hearing on May 23, 2019, and on the same day, entered its initial permanency order pursuant to section 2-28 of the Act. 705 ILCS 405/2-28 (West 2018). No testimony was presented at the hearing and the parties stipulated to the admission of the permanency report without agreeing to its findings and recommendations. The permanency report had recommended a permanency goal of substitute care pending court determination on termination of parental rights; however, the State and the GAL agreed that, at that time, the goal should be return home within 12 months. The circuit court's written initial permanency order indicated that the circuit court had found that Kenneth had not made substantial progress towards returning the minor child home and directed that B.F. remain in the custody of DCFS with a permanency goal of returning home within 12 months. The matter was set for another permanency hearing on November 14, 2019.

¶ 15    DCFS filed a second permanency hearing report with the circuit court on November 1, 2019. The report indicated that Kenneth had not corrected the conditions that initially brought B.F. into care and that there had not been satisfactory progress or reasonable efforts by Kenneth towards returning B.F. home. The report indicated that Kenneth had been incarcerated in the Illinois Department of Corrections (IDOC) since approximately August 30, 2019, and had made unsatisfactory progress in his service plan. The report

7

recommended that Kenneth complete a substance abuse assessment, a mental health assessment, and follow all recommendations resulting from the assessments. The report also recommended that Kenneth obtain a stable and appropriate home as well as maintain all utilities and required payments upon his release from prison and that, upon his release, Kenneth should have visits with B.F. in a natural home setting where he could perform parental duties.

¶ 16     The report further noted that, prior to his incarceration, Kenneth had attended 10 out of 13 visits with B.F. but failed to appear for 2 of the visits and the third missed visit was due to transportation issues not attributed to Kenneth. The report also indicated that Kenneth ended his visitation early on three occasions. During the supervised visits, Kenneth did attend, feed, toilet, and supervise B.F. The report listed a safety threat to the minor child due to Kenneth's alleged or observed substance abuse that could have seriously affected his ability to supervise, protect, or care for B.F.

¶ 17     Lastly, the report indicated that B.F. and her brother were residing together and thriving in the foster home and that her foster parents would like to adopt her if she should become free for adoption. The report recommended the permanency goal of substitute care pending court determination on termination of parental rights. This recommendation was based upon Kenneth's incarceration at the time of the report, his failure to complete the recommended services, his failure to correct the condition that brought B.F. into care, and his being unprepared to care for B.F.

¶ 18     On November 14, 2019, the circuit court conducted another permanency hearing and entered a subsequent permanency order. Kenneth was not present at the hearing due to

8

his incarceration; however, counsel was present on his behalf. The State presented the testimony of Sara Sauerhage, who was a child welfare specialist for DCFS and who prepared the second permanency hearing report. Sauerhage testified consistently with her report discussed above, adding that Kenneth had refused to sign a voluntary acknowledgement of paternity. Sauerhage stated that DNA testing would be beneficial and requested the circuit court to order that DNA testing be completed.

¶ 19    The circuit court entered the second permanency order finding that Kenneth had not made substantial progress towards returning the minor child home and directing that B.F. remain in the custody of DCFS. It is noted that the circuit court made its finding of the goal of return home on the record; however, the written order[4] has both a permanency goal of returning home within 12 months and substitute care pending court determination on termination of parental rights. The circuit court set the matter for a third permanency hearing on May 14, 2020.

¶ 20    DCFS filed a third permanency hearing report with the circuit court on April 23, 2020. Similar to the second permanency report, this report indicated that Kenneth had not corrected the conditions that initially brought B.F. into care and that there had not been satisfactory progress or reasonable efforts by Kenneth towards returning B.F. home. Kenneth remained incarcerated and had self-disclosed that he participated in a substance abuse program for 15 hours per week. As such, the report indicated that Kenneth had made

---

[4]We note that although a written order of the circuit court is evidence of the judgment of the circuit court, the trial judge's oral pronouncement is the judgment of the court. Therefore, where the oral pronouncement of the court and its written order are in conflict, the oral pronouncement controls. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 87.

satisfactory progress as to this goal. Kenneth had also self-disclosed that he had completed a mental health assessment and was on the waitlist for an anger management program. The report indicated that he had made unsatisfactory progress as to this goal.

¶ 21 The report further recommended that Kenneth obtain a stable and appropriate home as well as maintain all utilities and required payments upon his release from prison, but since he was incarcerated, he had made unsatisfactory progress as to this goal. Again, it was recommended that, upon his release, Kenneth have visits with B.F. in a natural home setting where he could perform parental duties. Kenneth had begun in-person visits with B.F. at the prison; however, those visits were suspended due to IDOC's COVID-19 policies. The report also indicated that Kenneth had self-disclosed that he had completed a parenting course, so Kenneth was rated in the report as making satisfactory progress as to this goal. Finally, the report indicated that Kenneth had completed the court-ordered paternity test and was established as the father of B.F. Accordingly, the report rated him satisfactory as to this goal.

¶ 22 Despite this reported progress, the report recommended the permanency goal of substitute care pending court determination on termination of parental rights. This recommendation was based upon Kenneth's current incarceration, his failure to complete the recommended services, his failure to correct the conditions that brought B.F. into care, and his being unprepared to care for B.F., as well as the stability of the current foster home.

¶ 23 On June 15, 2020, the circuit court conducted another permanency hearing. Kenneth was not present at the hearing due to being ill with an active COVID case; however, counsel was present on his behalf. No testimony was presented at the hearing, and Kenneth's

counsel stipulated to the entry of a third permanency order finding that there had not been substantial progress in the prior 12 months but leaving the permanency goal as return home. The circuit court entered the third permanency order and set the matter for another permanency hearing on December 17, 2020.

¶ 24 DCFS filed a fourth permanency hearing report with the circuit court on December 3, 2020. The report indicated that Kenneth was convicted of child endangerment that resulted in the death of a child and was sentenced to a term of six years of incarceration with a projected parole date of March 2, 2022. The findings and recommendations of this report were similar to the prior reports filed with the circuit court. The report did expound upon Kenneth's engagement in services while in custody and that he was rated satisfactory on his progress with his goals regarding substance abuse, mental health, parenting classes, and visitation. He was rated unsatisfactory, however, on his progress with his goals of obtaining a stable home, anger management classes, and domestic violence services. This report again recommended the permanency goal of substitute care pending court determination on termination of parental rights.

¶ 25 On December 17, 2020, the circuit court entered an order to continue and reset the permanency hearing to February 25, 2021; however, the circuit court also entered a fourth permanency order on the same December 17, 2020, date. A transcript of these proceedings is not included in the record on appeal, but the circuit court's written order indicates that counsel for Kenneth and the state's attorney were present. The circuit court entered the fourth permanency order indicating that Kenneth had not made substantial progress

towards returning the minor child home and directed that B.F. remain in the custody of DCFS. The matter was set for a permanency hearing on February 25, 2021.

¶ 26    DCFS filed its fifth permanency hearing report with the circuit court on April 16, 2021. The findings and recommendations of this report were similar to the prior report filed with the circuit court on December 3, 2020. The report again rated Kenneth satisfactory on his progress with his goals regarding substance abuse, mental health, parenting classes, and visitation. He was again rated unsatisfactory on the progress with his goals of obtaining a stable home, anger management classes, and domestic violence services. This report also recommended the permanency goal of substitute care pending court determination on termination of parental rights.

¶ 27    On April 20, 2021, the circuit court conducted its fifth permanency hearing in this matter and entered a subsequent permanency order. Kenneth was present at the hearing with counsel. Testimony was presented by Sauerhage who prepared the fourth and fifth permanency hearing reports. Sauerhage testified consistently with her reports as discussed above and stated that her opinion was that the permanency goal should be changed to substitute care pending court determination on termination of parental rights. Sauerhage based her opinion on the fact that Kenneth was incarcerated and was unsure when he would be released, and that B.F. had been in DCFS's care since June 2018. Further, Sauerhage stated that B.F. was thriving in her placement and was placed with her brother. The circuit court entered the fifth permanency order indicating its findings and changing the permanency goal to substitute care pending court determination on termination of parental rights. The matter was set for a fitness hearing on June 22, 2021.

¶ 28    Also on April 20, 2021, the State filed its motion for appointment of guardian with power to consent to adoption (motion for termination). The motion for termination alleged that Kenneth was an unfit person as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)), because he (1) had been convicted of an offense which resulted in the death of a child by physical abuse and (2) failed to make reasonable progress toward the return of the minor child within nine months after an adjudication of abuse, neglect, or dependency, during any nine-month period, including May 23, 2019, to February 23, 2020. Kenneth filed a response on May 24, 2021, denying the allegations of unfitness.

¶ 29    On June 21, 2021, DCFS filed an unfitness/best interest court report (unfitness report). The unfitness report described Kenneth's prior history with DCFS including the fact that Kenneth was indicated for substantial risk of physical injury/environment injurious to health and welfare by neglect on May 1, 2018. The unfitness report also noted that Kenneth was indicated for head injuries and the death of a child on that same date. The unfitness report further stated that Kenneth was convicted of child endangerment that resulted in the death of a child and was sentenced to a term of six years of incarceration with a projected parole date of March 2, 2022. Similar to the prior permanency reports, the unfitness report rated Kenneth as satisfactory on his progress with his goals regarding substance abuse, mental health, parenting classes, and visitation, and unsatisfactory on the progress with his goals of obtaining a stable home, anger management classes, and domestic violence services.

¶ 30    The circuit court conducted a fitness hearing on June 22, 2021. Kenneth was present with counsel. The circuit court took judicial notice of Kenneth's guilty plea to the charge

13

of child endangerment causing the death of a child in Randolph County case No. 18-CF-241 and its previously entered permanency orders. At the hearing, the State presented the testimony of Sara Sauerhage who prepared the unfitness report. Sauerhage testified that she was the caseworker for B.F. and that she had been assigned to this case since May 2019. Sauerhage stated that it was her opinion that Kenneth was unfit as defined by statute because of his criminal conviction and his failure to make reasonable progress toward the return of the minor child within any nine-month period.

¶ 31 During cross-examination, Sauerhage testified that Kenneth was rated satisfactory on his goals of substance abuse counseling, mental health counseling, and parenting classes. She further stated that Kenneth was on a waiting list for anger management counseling and, therefore, was rated as unsatisfactory as to this goal. According to Sauerhage, Kenneth was to take part in domestic violence counseling, but Kenneth told Sauerhage that he had never been convicted of any domestic battery offense. Sauerhage testified that Kenneth was rated unsatisfactory on his goal of stable living conditions due to his incarceration and his uncertainty with respect to his plans upon release from prison. Further, Sauerhage opined that Kenneth did not make satisfactory progress until he was incarcerated. Sauerhage testified that it was her opinion that the circuit court should find Kenneth unfit based upon the fact that B.F. had been in DCFS's care for three years and that "we don't know how [Kenneth] is going to do upon release."

¶ 32 Kenneth also testified at the fitness hearing. Kenneth acknowledged that he pled guilty to the charge of child endangerment causing the death of a child and was serving a sentence in IDOC. He further acknowledged that on four occasions the circuit court had

14

previously found that he had not made substantial progress in the matter; however, he testified that he did not agree with those findings. Kenneth testified regarding his participation in substance abuse counseling, mental health counseling, anger management counseling, and parenting classes while incarcerated. He further testified that he loved and had a good relationship with B.F.

¶ 33     After closing arguments of counsel, the circuit court found, by clear and convincing evidence presented, that Kenneth was an unfit person as defined in section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)) for failing to make reasonable progress toward the return of the minor child within the nine-month period after the adjudication of abuse or neglect, including May 23, 2019, to February 23, 2020. The circuit court entered its written order on June 30, 2021, with a permanency goal of substitute care pending termination of parental rights. The circuit court set the matter for the best interest hearing on July 20, 2021, but the circuit court later continued the hearing to August 10, 2021.

¶ 34     On July 19, 2021, DCFS filed a best interest court report (best interest report). The content of the best interest report regarding Kenneth and B.F. was substantially the same as that contained in the unfitness report. The circuit court conducted the best interest hearing on August 10, 2021. Kenneth was present with counsel. Testimony was again presented by Sauerhage. Sauerhage testified that B.F. was thriving in her current placement and that she had been with the same foster family since coming into DCFS's care in 2018. Sauerhage stated that she had considered B.F.'s development and identities, background and ties, sense of attachment, community ties, and the least destructive placement

alternative. Sauerhage opined that it was in the best interest of B.F. that Kenneth's parental rights be terminated, and that B.F. be freed for adoption.

¶ 35    Upon cross-examination, Sauerhage agreed that the only services Kenneth failed to complete were those that could not be completed due to his incarceration. Sauerhage believed that the foster parents would continue to be supportive of a relationship with Kenneth as long as he was "clean." The circuit court inquired of the GAL who agreed with the State's position that providing stability, permanency, and a stable, loving home was in B.F.'s best interest. Accordingly, the GAL requested that the circuit court terminate Kenneth's parental rights. The circuit court found it to be in the child's best interest to terminate Kenneth's parental rights, basing its decision on the testimony presented and the permanency reports filed.

¶ 36    That same day, August 10, 2021, the circuit court entered a written order terminating Kenneth's parental rights. The written order indicated that on June 22, 2021, the circuit court found by clear and convincing evidence that Kenneth was an unfit person and that, by a preponderance of the evidence, it was in the best interests of B.F. that Kenneth's parental rights be terminated. The circuit court then terminated Kenneth's parental rights and vested guardianship of B.F. with DCFS.

¶ 37    Kenneth now appeals the circuit court's judgment terminating his parental rights arguing that the State failed to prove that he did not make reasonable progress towards the return of the minor child during any nine-month period following the adjudication of abuse or neglect. Kenneth also argues that the circuit court erred in finding him an unfit person

16

and that the State failed to prove that the termination of his parental rights was in the best interests of the minor child.

¶ 38                                   II. ANALYSIS

¶ 39    "A parent's right to raise his or her biological child is a fundamental liberty interest, and the involuntary termination of such right is a drastic measure." *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 28. The Act (705 ILCS 405/1-1 *et seq.* (West 2020)), along with the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)), governs the proceedings for the termination of parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). The Act provides a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). 705 ILCS 405/2-29(2), (4) (West 2020); *In re D.T.*, 212 Ill. 2d 347, 352-53 (2004). If the court finds the parent unfit, the State must then show that termination of parental rights would serve the child's best interests. 705 ILCS 405/2-29(2) (West 2020); *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 28.

¶ 40                               A. Parental Unfitness

¶ 41    A determination of parental unfitness involves factual findings and credibility assessments that the circuit court is in the best position to make, and a finding of unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889-90 (2004). "A factual finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the determination is

arbitrary, unreasonable, and not based on the evidence." *In re G.W.*, 357 Ill. App. 3d 1058, 1059 (2005).

¶ 42 In the present case, the circuit court concluded that the State had successfully proven one ground of unfitness against Kenneth. Specifically, the circuit court found that Kenneth failed to make reasonable progress toward the return of B.F. in any nine-month period following the adjudication of neglected or abused, including May 23, 2019, to February 23, 2020. Kenneth argues on appeal that the circuit court erred in finding him an unfit person by clear and convincing evidence and asserts that the evidence demonstrates that during his incarceration he made reasonable, measured progress, and completed all the goals of his service plan, except those that were physically impossible for him to complete. As such, Kenneth argues that the goals he did not complete were out of his control due to his incarceration. Kenneth requests this court to consider the particular facts of this case and determine that he was making progress with each permanency review. Kenneth points to the fact that, at the time of the unfitness hearing, he had completed five of his seven goals, and that the two goals he was rated unsatisfactory were those of stable housing and employment.

¶ 43 The State acknowledges on appeal that Kenneth's ability to fully comply with the service plan was compromised due to his incarceration but argues that his incarceration was of his own creation. The State further contends that Kenneth had not engaged in any services prior to his incarceration and, in fact, had only fully completed the task of parenting classes while incarcerated.

18

¶ 44    Kenneth also contends that no evidence was presented by the caseworker that he would not be released to a stable home and obtain employment, but rather, a normal condition of his mandatory supervised release is that he obtain employment and have a stable address. In contrast, the State argues that the burden rests with Kenneth to provide meaningful evidence of his housing plans upon release or of his plans to continue with counseling, but that he failed to do so. As such, the State argues that the circuit court's findings that Kenneth was an unfit person was not against the manifest weight of the evidence. We agree with the State.

¶ 45    We acknowledge that the circuit court had to consider, as it did and as we do now, the availability of services Kenneth needed to progress in his service plan. While the mere fact of incarceration alone is not evidence of failure to make reasonable progress, incarceration can impede progress toward the goal of reunification. *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21. Our supreme court has clearly held that time spent incarcerated is included in the nine-month period during which reasonable progress must be made under section 1(D)(m) of the Adoption Act, as the statute contains no exception for incarcerated parents. 750 ILCS 50/1(D) (West 2020); *In re J.L.*, 236 Ill. 2d 329, 343 (2010).

¶ 46    Further, reasonable progress is an objective standard that is not concerned with a parent's individual efforts and abilities. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). We review reasonable progress using an objective standard relating to making progress toward the goal of returning the child home. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). Reasonable progress requires measurable or demonstrable movement toward the goal of reunification, and reasonable progress can be found if the trial court can conclude that it

19

can return the child to the parent in the near future. *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22.

¶ 47    Although it is commendable that Kenneth began services upon his incarceration, the fact remains that prior to his incarceration Kenneth did nothing to begin, let alone make reasonable progress towards, the completion of his service plan goals. Kenneth's incarceration alone did not prevent him from complying with the service plan, as he was rated as unsatisfactory on all services during his permanency hearing on May 10, 2019, prior to his incarceration. Even with the services Kenneth engaged since his incarceration, he failed to demonstrate that the services were completed, with the exception of his parenting class. More importantly, Kenneth failed to demonstrate that he would be able to complete his plan's requirements, including the obtainment of housing and employment, upon his release from prison at any point in the near future.

¶ 48    According to Kenneth's argument, his efforts to complete his goals while incarcerated show not only measured progress but also improvements as time progressed. Although DCFS service plans are an integral part of the statutory scheme, our supreme court has rejected the view that the sole measurement of parental progress is the parent's compliance with service plans. *In re C.N.*, 196 Ill. 2d 181, 214-15 (2001). Instead, the supreme court has ruled that:

> "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of

20

other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *Id.* at 216-17.

¶ 49 Moreover, it has been repeatedly stated that "a court is duty bound to ensure that serious parental deficiencies of whatever nature have been corrected before the court permits one of its wards to be returned to that parent's custody." *In re L.L.S.*, 218 Ill. App. 3d 444, 464 (1991); see also *In re C.M.*, 305 Ill. App. 3d 154, 164 (1999); *In re C.S.*, 294 Ill. App. 3d 780, 790 (1998). Subsequent to B.F. being taken into care, Kenneth was incarcerated and not expected to be released until March 2, 2022. Once released, Kenneth would still have been required to complete domestic violence counseling and to show that he could maintain proper housing, employment, and provide a safe environment. Based on these factors, this court sees no basis on which the trial court could have found that it would have been able to order B.F. returned to Kenneth's custody in the near future.

¶ 50 Finally, Kenneth argues that some of the listed goals should have never been assigned to him. He highlights that he did not have any convictions for domestic battery and that there was sparse hearsay evidence regarding domestic violence even occurring, even though domestic violence counseling was always recommended. We first note that the circuit court's finding of adjudication was based on injurious environment, partially caused by the domestic violence issues alleged by the State. Further, Kenneth had the opportunity to object to the inclusion of services in the service plan at the permanency hearings held in the circuit court. The purpose of a permanency hearing is to determine the future status for the child by setting the permanency goal and reviewing and determining the appropriateness of the services contained in the plan and whether those services have

21

been provided. 705 ILCS 405/1-3(11.2) (West 2020). Kenneth did not argue at the circuit court that any of his assigned services were inappropriate.

¶ 51 Nonetheless, a service plan must reasonably relate to remedying the conditions that gave rise, or that could give rise, to any finding of child abuse or neglect. 325 ILCS 5/8.2 (West 2020). Kenneth's conviction for child endangerment which resulted in the death of a child, in addition to the issues identified in the integrated assessment, and Randall's testimony at the adjudicatory hearing that there had been several contacts with local law enforcement being called to the home to break up fights between Kenneth and mother, demonstrate that the service plan's requirements were reasonably related to the conditions that could give rise to a finding of neglect.

¶ 52 Based on the foregoing, the record includes clear and convincing evidence that Kenneth failed to make reasonable progress during any nine-month period following the adjudication of neglected or abused, including May 23, 2019, through February 23, 2020, and the circuit court's finding that Kenneth was an unfit person as defined in section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)) was not against the manifest weight of the evidence. Having concluded that the circuit court's finding that Kenneth was an unfit person was not against the manifest weight of the evidence, we now turn our attention to the circuit court's best interest determination.

¶ 53                                          B. Best Interests

¶ 54 If the circuit court finds the parent unfit, the matter proceeds to a second hearing, where the State must prove, by a preponderance of the evidence, that it is in the child's "best interests" that parental rights be terminated. 705 ILCS 405/2-29(2) (West

2020); *In re D.T.*, 212 Ill. 2d at 366. During the second step of the process, the focus of the court's scrutiny shifts from the rights of the parents to the best interests of the child. *In re D.T.*, 212 Ill. 2d at 365. Section 1-3 of the Act lists the "best interests" factors that should be considered by the trial court when making a "best interests" determination. 705 ILCS 405/1-3(4.05) (West 2020).

¶ 55    In making a best interest determination, the trial court must consider the following factors in the context of the child's age and developmental needs: (1) the physical safety and welfare of the child, (2) the development of the child's identity, (3) the child's background and ties, (4) the child's sense of attachments, (5) the child's wishes, (6) the child's community ties, (7) the child's need for permanence, (8) the uniqueness of every family and child, (9) the risks attendant to entering and being in substitute care, and (10) the preferences of the persons available to care for the child. *Id.* The circuit court, having observed the witness and heard the testimony, is in a better position to weigh this evidence. *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 66. The circuit court's best interest determination will be reversed only if it is against the manifest weight of the evidence. *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 56    Kenneth contends, for the reasons stated and argued above as well as argued in this section, that termination of his parental rights was not in B.F.'s best interests. Kenneth asks this court to consider the bond between a parent and child as shown in his participation in his visits with B.F. The ability to bond, however, is not the same as the ability to provide a safe and stable environment for a minor child. As the State notes, the circuit court was presented with, and considered, the sufficient evidence of the required best interests factors

23

including testimony regarding the bond between B.F. and Kenneth. The circuit court also heard testimony regarding the bond between B.F. and her foster parents. The record shows that the circuit court reviewed the evidence and the best interest report before reaching its decision and that the statutory best interest factors supported its decision.

¶ 57    Kenneth next argues that while the State emphasized his conviction for the death of another child, there was no evidence that he ever harmed B.F. He further states that the circumstances surrounding the death of the child show that the death was accidental, not intentional. The facts and circumstances surrounding the death of that child were not included in the record and, therefore, not properly before us to consider. However, we are unpersuaded by Kenneth's contention. The evidence showed that Kenneth was convicted of the offense of child endangerment that resulted in the death of a child. Whether accidental or intentional, Kenneth caused the death of a child, and this goes to the very first enumerated factor the circuit court is required to consider, the physical safety and welfare of the child. Kenneth then points to the fact that he continued in a relationship with the deceased child's mother, and that they now have another child together. This fact, according to Kenneth, evidences his ability to care for a child. We disagree. It merely indicates his ability to father a child.

¶ 58    Kenneth also argues that there was no evidence presented that he and B.F. did not love one another, and that this court should consider that the foster parents wish to keep him in B.F.'s life. Kenneth fails to provide this court with any authority to support his argument that the trial court should have relied on the foster parents' wish to maintain a relationship between B.F. and Kenneth in determining the best interests of B.F. While we

agree that the testimony before the trial court was that B.F. and Kenneth love each other, the evidence also demonstrated that B.F. had been in the same foster case placement for over three years and that, during that period, B.F. had thrived, developed, and obtained a sense of permanence and stability.

¶ 59    Finally, Kenneth argues that the GAL should have submitted a formal, written report regarding B.F.'s best interests. We note that Kenneth fails to cite any authority in support of this argument, and we find that there is no requirement that a GAL prepare a written report in these types of proceedings. Here, the record clearly shows that the GAL was present and participated in the various hearings, ultimately agreeing with the State's and DCFS's recommendations. The circuit court properly evaluated the testimony related to the above best interest considerations, and we find that the circuit court's finding that termination of Kenneth's parental rights was in B.F.'s best interests was not against the manifest weight of the evidence.

¶ 60                                    III. CONCLUSION

¶ 61    For the preceding reasons, we have determined that the circuit court's findings that Kenneth was an unfit person, and that termination of his parental rights was in the best interest of B.F., were not against the manifest weight of the evidence. As such, we find that the circuit court's judgment terminating Kenneth's parental rights was not against the manifest weight of the evidence and affirm the judgment of the circuit court.

¶ 62    Affirmed.

25