NO. 4-97-0331

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In the Interest of C.S., Jr., a Minor, )  Appeal from 

THE PEOPLE OF THE STATE OF ILLINOIS, )  Circuit Court of

Petitioner-Appellee,     )  Knox County  

     v. )  No. 94J69   

CLEO MORREL SINGLETON and STACY LYNN )              

SINGLETON, n/k/a STACY LYNN HEINE, )

Respondents-Appellants. )  Honorable

)  Gregory K. McClintock,

                        )  Judge Presiding.

_________________________________________________________________

JUSTICE STEIGMANN delivered the opinion of the court:

In June 1995, the trial court entered an order adjudg­ing C.S., Jr. (C.S.) (born September 14, 1994), the minor child of respon­dent mother, Stacy Lynn Singleton, n/k/a Stacy Lynn Heine, and respon­dent father, Cleo Morrel Single­ton, a neglected minor.  After a September 1995 dispositional hearing, the court formally adjudi­cated C.S. a ward of the court and ap­pointed the Department of Children and Family Services (DCFS) as his guardian with the power to place him.  

In Novem­ber 1996, the State filed a peti­tion to termi­nate the respondents' parental rights regard­ing C.S.  During January and March 1997, the trial court con­duct­ed hearings and found respon­dents to be unfit parents.  In April 1997, the court con­ducted a dispositional hearing and granted the State's peti­tion to termi­nate their parental rights.  

Respon­dents ap­peal, arguing that (1) the trial court's June 1995 order adjudicat­ing C.S. a ne­glect­ed minor and its September 1995 dispositional order are void; and (2) the court's finding of paren­tal unfit­ness was against the mani­fest weight of the evi­dence.  We dismiss respon­dent parents' appeal of the court's June 1995 and September 1995 orders and otherwise affirm.

I.  BACKGROUND

In June 1994, the State filed a petition for adjudica­tion of wardship, alleging that respondents had neglected C.S. because (1) they did not provide the proper or necessary support or other care necessary for his well-being, including adequate food, clothing, and shelter; and (2) they created an environment injurious to his welfare.  After hear­ings conducted from March 1995 through June 1995, the trial court entered an order adjudi­cat­ing C.S. a ne­glect­ed minor, pursu­ant to section 2-3(1) of the Juve­nile Court Act of 1987 (Act) (705 ILCS 405/2-3(1) (West 1994)).  In Septem­ber 1995, the court held a dispositional hearing and adjudged C.S. a ward of the court, placing him in the custody and guard­ianship of DCFS.

At the dispositional hearing, the trial court ordered respon­dents to cooperate with DCFS, participate in ongoing parenting educa­tion, and participate in counseling (including psychiatric evalua­tions and treatment).  The court also ordered respondent father to complete a psychological evaluation and participate in any recommended treatment regarding a prior criminal sexual abuse conviction.  Respondent parents' October 1995 DCFS service plan also required that they (1) cooperate with all scheduled home vis­its; (2) maintain a two- to three-day supply of food in their home at all times; (3) demon­strate learned parenting skills during visits with C.S.; (4) secure additional parenting infor­ma­tion through a visitation specialist; (5) main­tain their home by clean­ing up animal feces and urine, taking out garbage as needed, cleaning out the litter box twice weekly, and cleaning floors daily; (6) remove untrained animals from their home; (7) estab­lish and follow a monthly budget; and (8) main­tain working utilities in their home.  The service plan required respon­dent mother to participate in any recommended counseling and treatment to address her inability to control her anger and frus­tra­tion, marital conflicts, placement of her other children, parenting skills, and self-esteem.  The service plan also required respondent father to partici­pate in any recommended treatment to address marital issues, dependency issues, parenting skills, stress, and risk of sexual abuse.           

In November 1996, the State filed a petition under sections 1(D)(m) and 1(D)(p) of the Adoption Act to termi­nate respondents' paren­tal rights, alleg­ing that respon­dents were unfit because (1) they failed to "make reason­able ef­forts to cor­rect the con­di­tions that were the basis for the remov­al of the child from the parent, or to make rea­son­able prog­ress toward the return of the child" since the June 1995 adjudication of neglect; and (2) they were unable to discharge their paren­tal re­sponsi­bil­ities due to mental impair­ment, mental ill­ness, or mental retar­da­tion (750 ILCS 50/1(D)(m), (D)(p) (West Supp. 1995)).   

At the hearings on the State's petition to terminate parental rights, the evidence showed the following.  Theodore Mathews, a clini­cal psy­chol­o­gist, testi­fied that he conducted psychologi­cal evalua­tions of both respon­dent par­ents and found that respon­dent mother's intelligence was in the low-normal range but not so low as to interfere with her ability to parent C.S.  Her problems as a parent were more likely to be motiva­tional than the product of her limited intelligence.  She would be unlikely to spend the energy and time necessary to care for her child over any protracted period of time.

Mathews also testified that respondent father was markedly impair­ed in his ability to (1) maintain attention and concen­tration on a child's needs for more than a short period of time, (2) work with others to provide guidance to a child without distrac­tion from his own emotional problems, (3) respond appro­priately to necessary changes in family routine, and (4) tolerate the normal stress of dealing with children in a family setting.  Mathews further stated that he ad­dressed the issue of respon­dent father's history of sexual abuse (with a child other than C.S.) and con­clud­ed that respon­dent father exhibited "little will­ing­ness *** to recognize any respon­sibility for the sexual abuse." 

Dr. Walid Maalouli, a pediatrician, testified that C.S. was born prematurely and exhibited significant developmental delays.  At the time of the hearing, C.S. continued to exhibit devel­opmen­tal delays and required special treatment, including physi­cal therapy and nutritional supplements.

Laurie Jean Mackay, a family support worker at Bridgeway Family Services, testified that she worked with respon­dents during June 1995 through November 1996 on issues such as parenting, budget­ing, ade­quate hous­ing, safety, and transpor­tation.  From June 1995 until August 1995, respondent parents lived in an apart­ment that was roomy and neat, but "had a horri­ble smell."  Mackay stated that on her weekly visits, she fre­quently noticed animal feces on the floor.  Another family support worker testified about her efforts to teach respondent parents basic parenting skills and her difficulties in doing so because they usually arrived late to these sessions and respon­dent mother had difficulty maintaining focus.  

In August 1995, respondent parents were evicted and moved to an efficiency apartment (where they lived at the time of the hearings on the petition to terminate).  That apartment was infest­ed with hundreds of roach­es.  The apartment did not have a kitchen sink, and at one point, respondents had a cat which used as a litter box the same bathtub used to wash dishes.  Respon­dents also allowed dog feces to remain on the kitchen floor for over a day at a time.  During the period of time when C.S. was visiting there, Mackay saw cock­roaches (some of which respon­dents had squashed and not cleaned up) and animal feces on the floor.   During the entire time Mackay worked with respondents (June 1995 until Novem­ber 1996), respon­dents kept a variety of animals, many of which were not house-trained.   

 Mackay further stated that respon­dent mother refused to work with Mackay to estab­lish a budget because respondent mother had a representative payee who re­ceived her Supplemental Security Income check and issued checks to her as she requested them.  On several occa­sions, respon­dent mother was argu­men­ta­tive and physically confrontational toward Mackay (swing­ing her arms at Mackay numerous times and throw­ing an object on one occasion).

Jennifer Foster, the social worker who supervised respondents' visits with C.S. following the June 1995 adjudica­tion order, testi­fied that they missed about one visita­tion per month when visits took place at DCFS.  During visits, respon­dents often spoke to each other and Foster about topics unconnected to C.S., and they would ignore what C.S. was doing.  Respon­dents also had problems feeding and diapering their child.  

Around March 1996, the visits were moved to respon- dents' apart­ment.  Respondents usually were avail­able for those visits, although they sometimes would have just awakened upon Foster's arrival with C.S.  Respon­dent mother fre­quently sat on the floor with C.S. without interacting with him.  During home visits, Foster noticed roaches, animal feces, and urine on the floor.  Further, respondent parents were unable to ade­quately perform the physi­cal therapy that C.S. re­quired twice daily.  

Through November 1996, no unsuper­vised visits were allowed because the home conditions were not safe enough and respondent parents were unable to maintain a visit for two hours without supervision.  Foster opined that the home environ­ment was dangerous for C.S. and respondent parents would never be able to provide the necessary care to C.S.  

Jacqueline Bryant, the DCFS child welfare specialist, testified that she developed a client service plan for respondent parents following the June 1995 adjudication order.  The service plan includ­ed the goals of main­tain­ing a clean home, proper budgeting, dealing with respon­dent father's sexual abuse history, and dealing with respondent mother's anger prob­lems.  In October 1995, Bryant evaluated respondents' prog­ress as unsatis­factory on all goals.  In partic­ular, respondent father denied past sexual abuse (de­spite the fact that he had been convicted), and respon­dent mother refused to seek counseling for her anger control problems.   

At the conclusion of the March 1997 hearing, the trial court found respon­dents to be unfit pursu­ant to section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West Supp. 1995)).  In April 1997, the court found it was in the child's best inter­est to termi­nate respondents' parental rights.

II.  ANALYSIS

A. The Trial Court's Adjudicatory and Dispositional Orders

Respondents first argue that the trial court's June 1995 order adjudicating C.S. a neglected minor and its September 1995 dispositional order are void.  Specif­ically, they contend that because the adjudicatory and dispositional hearings were not held within the statutorily prescribed time limits, the trial court lacked subject-matter jurisdiction to enter the orders it did, thus rendering them void and subject to attack at any time.  We ­disagree. 

1. 
Subject-matter Jurisdiction
  

Respondents correctly point out that (1) section 2-14 of the Act requires that adjudicatory hearings be completed within 90 days of service of process upon the parties; and (2) section 2-21 of the Act requires that dispositional hearings be held within 30 days of the adjudi­cation of neglect or abuse (705 ILCS 405/2-14, 2-21 (West 1994); 
In re S.G.
, 175 Ill. 2d 471, 481, 677 N.E.2d 920, 925 (1997)).  The adjudi­ca­to­ry hearing in this case was not com­pleted until June 27, 1995, well beyond the 90-day statu­to­ry dead­line.  Further, the disposi­tional hearing was not held within the 30-day statuto­ry limit.  Nonethe­less, the trial court's failure to comply with these statuto­ry dead­lines did not deprive it of sub­ject-matter juris­dic­tion.  

Except in the limited area of adminis­trative re­view, circuit court juris­dic­tion is exclu­sive­ly consti­tution­al in origin.  Although the legisla­ture has no power to limit a court's consti­tutional jurisdiction to hear a matter, it may, by way of statu­tory enactment, create a "justi­ciable mat­ter." 
 
In re M.M.
, 156 Ill. 2d 53, 65, 619 N.E.2d 702, 709-10 (1993).  Once a justicia­ble matter is created, circuit courts obtain subject-matter jurisdic­tion over such matters by way of the constitution.  
M.M.
, 156 Ill. 2d at 65, 619 N.E.2d at 710.  In cases where "a court's power to act is con­trolled by statute, *** courts exer­cising jurisdiction over such matters must proceed within the strictures of the statute."  
M.M.
, 156 Ill. 2d at 66, 619 N.E.2d at 710 (juvenile court proceedings constitute special statutory pro­ceed­ings).  In 
M.M.
, the supreme court held that "[w]ithout question, the juvenile court *** had subject matter jurisdic­tion," but the court "ex­ceeded its statu­to­ry author­i­ty" by condi­tioning the guard­ian's power to consent to an adop­tion.  
M.M.
, 156 Ill. 2d at 64, 66, 619 N.E.2d at 709, 710.  See also
 
In re P.F.
, 265 Ill. App. 3d 1092, 1105-06, 638 N.E.2d 716, 725-26 (1994) (circuit court lacked statutory author­i­ty to order DCFS to cease efforts at family reunifica­tion).  Thus, where a court in such a case fails to proceed "within the stric­tures of the stat­ute," the court does 
not
 somehow lose its constitutionally conferred subject-matter jurisdiction; instead, it simply pro­ceeds in error because it lacked "statutory author­ity."  

Any error the trial court committed here in not holding the adjudi­ca­to­ry and dispositional hear­ings prior to the statu­to­ry dead­lines did not render those orders void for lack of sub­ject-matter jurisdic­tion.  Thus, contrary to respondents' conten­tion, those orders are not subject to attack at any time. 

2. 
The Late-filed Notice of Appeal
 

Al­though the trial court entered its written order adjudi­cating C.S. a neglected minor on June 29, 1995, and its written dispositional order on September 14, 1995, respon­dent parents did not file a notice of appeal until April 24, 1997.  See 
In re Smith
, 80 Ill. App. 3d 380, 381, 399 N.E.2d 701, 702 (1980) (in general, it is the dispositional order from which an appeal lies).  Respondents' delay in filing a notice of appeal goes 
far
 beyond the 30-day limit set by Supreme Court Rules 303 and 660(b) (155 Ill. 2d R. 303; 134 Ill. 2d R. 660(b)), as well as beyond the period set for filing a late notice of appeal under Supreme Court Rule 303(d) (155 Ill. 2d R. 303(d)).  In 
In re S.J.
, 289 Ill. App. 3d 430, 431, 682 N.E.2d 444, 445 (1997) (Jenkins, appellant), quoting 
Martin v. Cajda
, 238 Ill. App. 3d 721, 728, 606 N.E.2d 566, 571 (1992), this court ad­dressed the issue of a late-filed notice of appeal in a juvenile court case and wrote as fol­lows:

"'[Completely dispositive of the issue before this court is the requirement that] "[t]o vest the appellate court with jurisdic­tion[,] a party must file a notice of appeal within 30 days after entry of [the] judgment appealed from."  [Citation.]  Compliance with the deadlines for appeals in Supreme Court Rule 303 is mandatory and jurisdictional [citations], and appellate jurisdiction may not be conferred by 
laches
, consent, waiv­er[,] or estoppel.'"
  

On the record before us, we agree with the State that this court lacks appel­late juris­diction over respondent parents' appeal of the trial court's June 1995 adjudicatory order and its September 1995 dispositional order.  Accordingly, we dismiss that portion of respondents' appeal.

B. Standard by Which Reasonable Progress Is To Be Measured

Prior to reaching respondents' argument regard­ing the trial court's finding of unfitness, we address respon­dents' request that this court recon­sider its deci­sion in 
In re L.L.S.
, 218 Ill. App. 3d 444, 577 N.E.2d 1375 (1991), in light of 
In re S.J.
, 233 Ill. App. 3d 88, 598 N.E.2d 456 (1992) (T.J., appel­lant).  For the follow­ing rea­sons, we decline to do so and reaf­firm 
L.L.S.

In 
L.L.S.
, this court addressed an argument by the respon­dent parents that reasonable progress must necessarily be tied to correcting the conditions that caused the initial removal of the minor child.  In rejecting that argu­ment, we wrote the following:

"[W]e do not believe it impossible to measure progress without referring to a 'prior sta­tus, current status[,] and the process by which movement from the one status to the other occurred.'  *** [I]n all cases in which a child is removed from a parent's custody after a dispositional hearing [cita­tion], a court order to that effect has been entered.  The reasons underlying that order should be one of the factors considered when the court (or an agency having authority to do so, like DCFS in the present case) decides what steps must be taken by the parent to achieve the return of the child to the parent's custody.  These steps should be designed to remediate parental deficiencies that, if not remediated, will prevent the child from being returned to the parent's custody.  Once these steps have been set forth and provided to the parent, either by the court, an authorized agency, or both, then the focus of subsequent inquiry ought to be on the parent's progress or success in complying with the court's directives, the service plan, or both.

If, as here, the State subsequently challenges the parent's fitness under section 1(D)(m) of the Act on the ground that the parent has failed to make reasonable progress toward the return of the child within 12 months after the child was adjudicated ne­glected, abused, or dependent, the standard by which progress is to be measured is paren­tal compliance with the court's directives, the service plan, or both.  The precise cir­cumstances of the parent at the time the court ordered the child removed from the child's parent and before the service plan was in place are 
not
 'indispensable' [cita­tion]."  (Emphasis in original.)  
L.L.S.
, 218 Ill. App. 3d at 463-64, 577 N.E.2d at 1388-89.

In 
S.J.
 (T.J., appellant) (233 Ill. App. 3d at 121, 598 N.E.2d at 477), the Second District Appellate Court declined to follow 
L.L.S.
 and held that "the ultimate issue is the reason­ableness of the progress that the parent has made, in light of all the circum­stances, in moving beyond the parental deficiencies that led to the initial removal of the child."  The court in 
S.J.
 (T.J., appellant) reasoned that (1) to hold the respondent mother's failure to comply with the specifics of the authorized agencies' service plans would "unfairly and irrationally elevate adminis­trative means over statutory ends"; and (2) to place "undue empha­sis on compliance with service plans would raise the danger of a form of 'bootstrapping' under which a parent could lose her rights to her children because she failed to do things that were not necessari­ly related to her previously established shortcom­ings as a parent."  
S.J.
 (T.J., appellant), 233 Ill. App. 3d at 120, 598 N.E.2d at 477.  

The second district in
 
S.J.
 (T.J., appellant), noting that the condi­tion under which S.J. was removed from the respon­dent mother's custody was the minor child's birth with cocaine in her system, charac­terized S.J.'s birth as a cocaine-addict­ed baby as a "unique event" that the respon­dent mother could have done nothing to cor­rect­ after her child's adjudi­cation of neglect.  
S.J.
 (T.J., appellant), 233 Ill. App. 3d at 117-18, 598 N.E.2d at 475.  The 
second district thus gave little weight to the respon­dent mother's failure to comply with much of what the authorized agencies requested of her, including inpa­tient drug treatment and enroll­ment in parenting classes.  
S.J.
 (T.J., appellant), 233 Ill. App. 3d at 120, 598 N.E.2d at 476.  Instead, because the respondent mother tested negative for cocaine after the adjudica­tion of neglect without having completed drug treat­ment (although she admit­ted­ly still used mari­jua­na to help her relax when her children strained her nerves), the second district re­versed the trial court's finding that she had failed to make reasonable progress.  
S.J.
 (T.J., appellant), 233 Ill. App. 3d at 121-22, 598 N.E.2d at 478.

We disagree with the above portions of 
S.J.
 (T.J., appellant).  We believe it makes no sense to so narrowly limit what the trial court can order a respon­dent parent to do follow­ing an adjudica­tion of neglect, abuse, or dependency.  How could it possibly be that the legisla­ture would tell the trial court that simply because the respondent parent has corrected 
one
 prob­lem, the court can--indeed, should--ignore other paren­tal defi­cien­cies, even if such defi­cien­cies could well threaten a child's well-being, safety, or life?  In our judgment, both the reasoning and result in 
S.J.
 (T.J., appellant) run con­trary to the purpose and procedural scheme of the Act.  

S.J.
 (T.J., appellant) assumes that trial courts in juvenile pro­ceed­ings address the issue of custody only at one point--namely, the dispositional hearing.  This is incorrect.  Courts in juve­nile proceedings frequently need to address the ques­tion of a minor's temporary custody in a shelter care hearing at the very inception of the case.  And even when a court has tempo­rari­ly removed a child from its parent's custody, the court must still address the issue of custody again at the later dispositional hear­ing, assuming the case reaches that point.  See 705 ILCS 405/2-23(1)(a) (West 1996).  Typically, the reports and other evidence presented at the dispositional hearing will provide the court with far more information concerning that parent, child, and family situation than the court possessed at the time of the shelter care hearing.  

The 
S.J.
 (T.J., appellant) analysis also ignores the procedure through which cases involving neglect, abuse, or depen­den­cy come before the juvenile court.  The initial circumstance presented to the trial court--which leads to its decision to remove custody from the parent--frequently turns out to be merely one of several serious problems.  However, the other problems often do not appear until further study and obser­vation of the child, parent, and family situation bring them to light.  Thus, what may appear to be a momentary lapse in parental judgment can turn out to be a symptom of more profound emotional, psycho­logical, or even psychiatric problems which impair the perfor­mance of paren­tal duties.  Further, substance abuse all too fre­quently simply masks other serious psychological difficul­ties which require distinct and separate treatment from the substance abuse.  

Consider the very situation present in 
S.J.
 (T.J., appellant)--namely, shortly after the child's birth, the State alleged the child was born with cocaine in her system, and the trial court temporarily placed the child in an agency's custody as a result of a shelter care hearing.  After later adjudi­cat­ing the child ne­glect­ed, the court ordered DCFS to conduct an inves­ti­ga­tion and make a report for the court's use at the disposi­tional hearing.  At that hearing, the court learned from the DCFS report that the mother had other serious paren­tal defi­cien­cies, such as abuse of alcohol and marijuana, wholly inade­quate parenting skills, and deplorable home condi­tions.  Assume that none of this was known to the court (or the State's Attorney or DCFS, for that matter) at the time the child at issue (S.J.) was born with cocaine in her system.  Thus, the neglect peti­tion the State filed--which was the sole basis for the court's taking custody of the child from the mother at the shelter care hearing--mentioned only that the child was born with cocaine in her system and did not refer to the other paren­tal defi­ciencies revealed for the first time in the DCFS report.  Under these circumstances, should the trial court be able to remediate 
only
 the mother's cocaine abuse while ignor­ing her other serious parental deficien­cies?  In our judg­ment, this cannot be so, and we reaf­firm what we wrote in 
L.L.S.
:        

"A par­ent is not di­vis­i­ble into neat com­part­ments; a child who is placed into a parent's custody 'gets the whole pack­age,' and a court is 
duty bound to ensure that serious parental defi­ciencies of 
whatev­er
 
nature
 have been cor­rected before the court permits one of its wards to be returned to that parent's custo­dy."  (Empha­sis added.)  
L.L.S.
, 218 Ill. App. 3d at 464, 577 N.E.2d at 1389.

In support of our rejection of 
the second district's view of reasonable progress and reaffirmance of 
L.L.S.
, w
e note that section 2-21 of the Act pro­vides that to assist the trial court in making deter­minations at the dispositional hearing (including whether it is in the best inter­ests of the child and the public that the child be made a ward of the court), the court may order
 that an inves­tigation be con­duct­ed and a dispositional report be pre­pared.  705 ILCS 405/2-21(2) (West 1994).  This section does not limit the scope of the investiga­tion and dispositional report to those conditions that led to the child's initial removal.  Instead, section 2-21(2) of the Act provides that the trial court may order that a dispositional report be prepared:

"concerning the minor's physical and mental history and condi­tion, 
family
 
situa­tion
 
and
 
back­ground
, econom­ic status, educa­tion, occu­pation, history of delinquen­cy or crimi­nali­ty, personal habits, and 
any
 
other
 
informa­tion
 
that
 
may
 
be
 
helpful
 
to
 
the
 
court
."   (Em­phasis added.)  705 ILCS 405/2-21(2) (West 1994).  

Moreover, we note that the trial court's responsibility with regard to the question of custody does not end with the dispositional hearing.  To prevent children from having to remain indefinitely in foster care, the legislature has recently mandat­ed that the juvenile court conduct permanency review hearings no less than every six months for each child who has been removed from the custody of his or her biological parents.  Public Act 90-28 (Pub. Act 90-28, §10-20, eff. January 1, 1998 (1997 Ill. Legis. Serv. 1792, 1846-48 (West), amending 705 ILCS 405/2-28(2) (West 1996)).  Section 2-28(3)(a) of the Act re­quires the juve­nile court to address the question of custody at each perma­nency review hear­ing.  705 ILCS 405/2-28(3)(a) (West 1996).  

Indeed, the legisla­ture has been so concerned about elimi­nating the problem of children languishing in foster homes as a result of juvenile court proceedings removing them from their parents' custody that it 
twice
 amended section 2-28(2) of the Act within the last six months.  Public Act 90-27, ap­proved June 25, 1997 (Pub. Act 90-27, §30, eff. January 1, 1998 (1997 Ill. Legis. Serv. 1742, 1777-79 (West)), amended section 2-28(2) of the Act to require that the public agency that is the custo­dian of the child in question must prepare a written report for the permanen­cy review hear­ing that must "detail what progress or lack of prog­ress the parent has made in correcting the condi­tions requir­ing the child to be in care; whether the child can be returned home without jeopar­dizing the child's health, safety, and wel­fare, and if not, what permanency goal is recommended to be in the best interest of the child, and why the other permanen­cy goals are not appropri­ate."  1997 Ill. Legis. Serv. 1778 (West).

Public Act 90-28, approved June 25, 1997 (Pub. Act 90-28, §10-20, eff. January 1, 1998 (1997 Ill. Legis. Serv. 1792, 1847 (West)), also amended section 2-28(2) of the Act by adding the following:  

"The agency's written report must explain why the child cannot be returned home without jeopardiz­ing the child's health, safety[,] and welfare and why termina­tion of paren­tal rights or private guard­ianship is not in the best interests of the child.  The caseworker must appear and testify at the permanen­cy hearing."  

We note that both of these Public Acts also add many other provisions to sec­tion 2-28 of the Act, all of which are de­signed to strengthen the trial court's perma­nency determi­nation.

We also find support for our holding in the most recent legisla­tive amendments to section 1 of the Adoption Act.   Section 1(D)(m) of the Act was revised in Public Act 90-27 (Pub. Act 90-27, §45, eff. January 1, 1998 (1997 Ill. Legis. Serv. 1742, 1784 (West)) and Pub­lic Act 90-28 (Pub. Act 90-28, §10-25, eff. January 1, 1998 (1997 Ill. Legis. Serv. 1792, 1858 (West)) (amend­ing 750 ILCS 50/1(D)(m) (West 1996)), which together added the following emphasized lan­guage: 

"(m)  Failure by a parent to make rea­sonable efforts to correct the conditions that were the basis for the removal of the child from the parent, or to make reasonable progress toward the return of the child to the parent within 
9
 months after an adjudica­tion of neglected 
or
 abused minor 
under
 
Sec­tion
 
2-3
 
of
 
the
 
Juvenile
 
Court
 
Act
 
of
 
1987
 or dependent minor under 
Section
 
2-4
 
of
 
that Act
.  
If
 
a
 
service
 
plan
 
has
 
been
 
established as
 
required
 
under
 
Section
 
8.2
 
of
 
the
 
Abused and
 
Neglected
 
Child
 
Reporting
 
Act
 
to
 
correct the
 
conditions
 
that
 
were
 
the
 
basis
 
for
 
the removal
 
of
 
the
 
child
 
from
 
the
 
parent
 
and
 
if those
 
services
 
were
 
available
, 
then
, 
for purposes
 
of
 
this
 
Act
, 
'
failure
 
to
 
make
 
rea­sonable
 
progress
 
toward
 
the
 
return
 
of
 
the child
 
to
 
the
 
parent
' 
in­cludes
 
the
 
parent's fail­ure
 
to
 
sub­stan­tially
 
fulfill
 
his
 
or
 
her obli­ga­tions
 
under
 
the
 
ser­vice
 
plan
 
and
 
cor­rect
 
the
 
condi­tions
 
that
 
brought
 
the
 
child into
 
care
 
with­in
 
9
 
months
 
after
 
the
 
adju­dica­tion
 
under
 
Section
 
2-3
 
or
 
2-4
 
of
 
the
 
Juv
enile Court
 
Act
 
of
 
1987
."

Thus, section (1)(D)(m), as amended, provides that "failure to make rea­sonable prog­ress toward the return of the child to the parent" in­cludes 
both
 the parent's fail­ure to sub­stan­tially fulfill his obli­ga­tions under the ser­vice plan 
and
 the parent's failure to cor­rect the condi­tions that led to the minor child's initial removal.  Pub. Act 90-27, §45, eff. January 1, 1998 (1997 Ill. Legis. Serv. 1742, 1784 (West)).

In addition, we note that section 8.2 of the Abused and Neglected Child Report­ing Act (Reporting Act) sets forth what a service plan may entail, providing as fol­lows:  

"No service plan shall compel any child or parent to engage in any activity or re­frain from any activity which is not 
reason­ably
 
related
 
to
 
remedying
 
a
 
condi­tion
 
or
 
condi­tions
 that gave rise 
or 
which
 
could
 
give
 
rise
 
to
 
any
 
finding
 
of
 
child
 
abuse
 
or
 
ne­glect
."  (Emphasis added.)  325 ILCS 5/8.2 (West 1994).

Reading section 1(D)(m) of the Adoption Act and section 8.2 of the Reporting Act together, these sections (1) indicate that the legis­lature has quite understandably provided that the measure of reason­able prog­ress encom­passes those condi­tions which 
could
 
give
 
rise
 to a finding of abuse or neglect (not merely those condi­tions which led to the initial removal of the minor child); and (2) support our rejec­tion of 
S.J.
 (T.J., appellant) and the reaffirmance of our holding in 
L.L.S.
 that "the standard by which progress is to be measured is paren­tal compli­ance with the court's direc­tives, the service plan, or both" (
L.L.S.
, 218 Ill. App. 3d at 463-64, 577 N.E.2d at 1389).  

As this discussion demonstrates, trial courts in juvenile proceedings must continuously revisit the question of custody.  Each time the court does so, it has the option of either returning custody to the parent, continuing custody of the child in the agency, or removing custody of the child from a parent and placing the child in the custody of an agency.  This carefully constructed statutory scheme demonstrates the erroneous premise of 
S.J.
 (T.J., appellant)--namely, that the court removes custody from a parent at a single, identifiable moment of the juvenile court process, and that moment forever freezes the issues which a parent must address in order to make reasonable progress to obtain the return of the child's custody.

C.  Parental Unfitness

The material in this section is not to be published pursuant to Supreme Court Rule 23.  166 Ill. 2d  R. 23.

Nonpublishable material under Supreme Court Rule 23 omitted.

III.  CONCLUSION

For the reasons stated, we dismiss respondents' appeal of the trial court's June 1995 and September 1995 orders and other­wise affirm the court's judgment.

Appeal dismissed in part and affirmed in part.

COOK and GREEN, JJ., concur.