2022 IL App (2d) 210609-U
No. 2-21-0609
Order filed February 25, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* V.K., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| | ) | |
| | ) | No. 16-JA-40 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Kayli B, | ) | Anthony V. Coco |
| Respondent-Appellant). | ) | Judge, Presiding. |

**ORDER**

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

¶ 1    *Held*:  Mother forfeited her arguments about the timeliness of the adjudicatory hearing and the applicable nine-month period for assessing her efforts and progress toward reunification with the minor child.

¶ 2    Respondent, Kayli B. (Mother), appeals the order of the circuit court of Du Page County finding that she is an unfit parent and that it was in the best interests of her minor child, V.K., to be made a ward of the court. Because Mother's arguments concerning the timeliness of the adjudicatory hearing and the applicable nine-month period to assess her reasonable efforts and progress have been forfeited, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    We summarize the relevant facts from the record on appeal. On August 9, 2016, the State

filed its original neglect petition, arguing that V.K. was a neglected minor because of Mother's recent hospitalization for heroin detoxification, and that it was in V.K.'s best interests to be made a ward of the court. On August 10, 2016, the circuit court held a temporary custody hearing. Neither Mother nor William K. (Father), who was V.K.'s father, attended. Following the hearing, the circuit court ordered V.K. to be placed in shelter care. On August 22, 2016, the circuit court held another shelter-care hearing, which Mother did attend. V.K.'s paternal grandmother (Grandmother) also attended the hearing, and she informed the court that she and her husband were fostering V.K. Mother indicated that she was "willing to stipulate to probable cause, immediate and urgent necessity[,] and reasonable efforts by [the Illinois Department of Children and Family Services (DCFS)]." Grandmother also informed the court that Father was currently checked into a 90-day in-patient rehabilitation program in California.

¶ 5    On October 25, 2016, the parties—except for Father—appeared for status. At that time, Mother indicated that she was not yet ready to file an answer to the State's neglect petition, as she was currently "engaged in intensive outpatient services." Accordingly, Mother requested to continue the matter to November 29, 2016, for answer and setting. The State agreed with continuing the matter, as it still needed time to serve Father.

¶ 6    On November 29, 2016, all the parties appeared, including Father. Mother requested continuing the matter to January 24, 2017, for status, and the circuit court granted her request. On January 24, 2017, the parties again appeared, and Mother indicated that she was currently receiving substance abuse treatment. Once again, Mother requested continuing the matter another "four to six weeks out," presumably to give herself time to continue treatment. Father joined Mother's request, indicating that he too was currently engaged in out-patient services. The court continued the matter.

¶ 7     On March 14, 2017, Mother requested continuing the matter to April 11, 2017, so that she could begin "a new outpatient treatment." Upon hearing Mother's request, Laura Lazda, a DCFS case worker, expressed reservations concerning the "numerous continuations" that the circuit court had already granted. Mother told the court that "[it was] not as if [the parties were] in the last month of a permanency review hearing," that Mother hadn't yet answered the State's petition, and that the parties still had an adjudicatory hearing, a dispositional hearing, and a permanency review hearing "to go through." Mother suggested that the court could "deny the [neglect] petition at this time, if [it was] seeking to answer," before setting a date for the adjudicatory hearing.

¶ 8     Father, who appeared at the hearing despite being in custody for domestic battery charges, joined Mother in seeking a continuance to April 11, 2017. Lazda was unavailable on this date, so the court instead set the next date for April 18, 2017. On that date, Mother requested a date in "th[e] last week of May [2017]" for the adjudicatory hearing. Upon agreement with the State, the hearing was scheduled for May 23, 2017.

¶ 9     On May 23, 2017, the parties appeared for the adjudicatory hearing. Mother was not personally present at the hearing, although her counsel still appeared. As a result of Mother's absence, her counsel requested another continuance.[1] Seemingly objecting to counsel's request, Lazda informed the court that, earlier that day, she had repeatedly tried to contact Mother about the hearing, but Mother would not answer her messages. The court denied counsel's request for a continuance. Afterwards, the State requested a one-week continuance, so that it could research an

---

[1] Upon hearing counsel's request, the State immediately asked the court for a default judgment. However, the court did not rule on this oral motion, and, as the State failed to put the motion in writing or raise it again, it appears that it was abandoned.

"issue" concerning the applicable timeline for the upcoming adjudicatory hearing. Karen Wilkerson, counsel for DCFS, objected as follows:

"MS. WILKERSON: Your Honor, as I stated earlier when we asked to pass this case, pursuant to [section] 2-14 [of the Juvenile Court Act (Act) (705 ILCS 405/2-14 (West 2016))], the timelines are very clearly set out that an adjudicatory hearing must be commenced within 90 days of the date of service of process upon the minor, the parent, legal custodian, [and] guardian.

The Court is allowed to grant one continuance for an adjudication for good cause. And good cause is strictly construed in the statute. It's not for convenience. It's not to get a report.

If the adjudicatory hearing is not heard within the time limits required by *** the statute, *** the petition shall be dismissed without prejudice."

Wilkerson further informed the court that, under the Act, "any of the parties *** may make a motion that the petition be dismissed without *** prejudice." Wilkerson expressed belief that they "kind of let this case slip here on th[ese] timelines." Nonetheless, the court continued the matter, so that the parties could make "legal argument" as to Wilkerson's "recommendation that the case be closed."

¶ 57    On May 30, 2017, the circuit court heard arguments concerning the timeliness of the adjudicatory hearing. However, Jillian Ruggiero, V.K.'s guardian *ad litem* (GAL), first informed the court that Father had passed away since the last court hearing. Regardless, the GAL clarified that Mother was "definitely still a player in this," although she was once again absent from the instant hearing. Mother's counsel told the court that he was unaware of Mother's current location. Lazda advised the court that she had called Mother that morning and left her messages indicating

that "her presence [at the hearing was] necessary." Mother's counsel suggested that, before they further discussed Mother's whereabouts, the parties should make legal arguments concerning the timeliness of the adjudicatory hearing. Counsel further indicated that he "concur[red] with DCFS' position" from the prior hearing and that "the statute is pretty clear" that the State's neglect petition needed to be dismissed.

¶ 10    In response, the State argued that Mother was not present "to say whether she would like to proceed on this or not on the waiver issue." The State further argued that, pursuant to *In Interest of C.S., Jr.*, 294 Ill. App. 3d 780 (1998), "where [the] [c]ourt fails to proceed within the stricture of the statute, the [c]ourt doesn't lose its constitutionally conferred subject matter jurisdiction, it simply proceeds in error because it lacks statutory authority." The State additionally contended that it would not be in the best interests of V.K. to dismiss the case, that "[M]other has not brought up any wish to go to adjudicatory hearing in these proceedings as of yet, and [that] this issue was brought up not by *** [M]other but by DCFS." The court asked the parties whether "DCFS [was] able statutorily to raise the issue." Wilkerson responded, "Oh, I believe so, Judge, because we have been appointed temporary custodian of the child, and the statute says upon [the motion of] any minor, parent, any guardian and any legal custodian, and that's what we are at this time, the custodian." Wilkerson argued that the State's reliance on *C.S., Jr.* was misplaced and that "[t]here [was] nothing on file" to indicate that Mother waived the 90-day timeline for the adjudicatory hearing. The court asked Wilkerson whether Mother could make a "*de facto* waiver" by "absent[ing] herself from court." Wilkerson responded, "I don't believe by the statute. I believe you have to have it either verbally or in writing that she waives the 90-day timeline." Mother's counsel agreed that "there needs to be a specific waiver, which was not done on the record."

¶ 11    At that point in the proceedings, Lazda informed the court that she had just spoken with

Mother, who informed her that instead of going to the hearing, she was "going to the zoo."

¶ 12    The parties turned back to the applicability of section 2-14 of the Act, and the GAL joined the State in arguing against dismissal. The court denied Mother's and DCFS' request to dismiss the neglect petition. Mother's counsel asked whether the court based its ruling "on any specific case law or the [Act]." The court responded, "Both and the choice of the mother not to appear on the last few court dates when we maybe could have gathered some information from her." The court similarly expressed frustration with Mother's choice to "go to the zoo as opposed to coming to court," as well as her reluctance to "go into treatment." Over Mother's counsel's objection, the court immediately began the adjudicatory hearing.

¶ 13    After indicating that it would proceed "by way of proffer," the State informed the court that it intended "to enter the default" and asked for a week for status "to prove that." While the parties were debating the next court date, the GAL interrupted, telling the court that "the proper way for the guardian would be to answer the neglect petition." The GAL then admitted all the allegations contained in the State's neglect petition. The State then made its proffer, and the circuit court found V.K. to neglected. The case was then continued for dispositional hearing.

¶ 14    On July 11, 2017, the circuit court held the dispositional hearing. Again, Mother was not present, and her counsel informed the court that he was unsure of her whereabouts. Counsel requested another continuance, which the circuit court denied. The State proceeded by proffer, specifying that Lazda would testify that, on April 20, 2017, she had informed Mother of "an open detox bed available for her" at a treatment center, which Mother refused. Lazda would also testify that, while meeting with Mother presumably concerning the open bed, she had noticed "fresh track marks" on Mother's forearms. Additionally, staff members from FACT had informed Lazda that they had discovered "empty and full syringes on a coffee table in the residence in which [Mother]

was staying." On June 12, 2017, Lazda had again approached Mother and "discussed progress towards getting her into a substance abuse treatment," but Mother had refused treatment on that date because "it was a nice day outside and [she] wanted to lay in the sun by the pool and get tan." Lazda believed that Mother still actively used heroin "and other drugs," and that Mother had "made zero progress in attaining sobriety" or "enhancing her bond with [V.K.]" Additionally, Mother had "not become employed or self-sufficient, and she increasingly engage[d] in dangerous behaviors."

¶ 15 After the State completed its proffer, the circuit court found "that it [was] in the best interests of [V.K.] and the public that [V.K.] be made a ward of the court." Additionally, the court took "judicial notice [of the fact] that [V.K.] was found to be a neglected minor on May 30th of 2017," that Father was deceased, and that Mother was "unfit or unable and unwilling for other than financial circumstances alone to care for or protect, train, or discipline the minor." Accordingly, V.K. was "adjudged a ward of the court" and was "placed in the guardianship and custody of DCFS *** for placement." A permanency goal was set "at return home within 12 months."

¶ 16 On September 12, 2017, the circuit court held its first permanency review hearing. The State and the GAL argued that Mother had "made no reasonable efforts and no progress," and pointed out that Mother had a history of positive drug test results since the dispositional hearing. In response, Mother argued that she did eventually complete "her detox," and was "involved in some treatment[,] which [was] much better than no treatment at all." The court noted that the "goal [was] going to remain [to] return home within 12 months," and found that Mother had made "some progress" and "some reasonable efforts."

¶ 17 On March 27, 2018, the court held the next permanency review hearing. Sabrina Limehouse, another DCFS caseworker assigned to the case, testified as to Mother's progress in completing her service plan. She noted that Mother had completed "some" drug and alcohol testing

"without urine diluting," but agreed that Mother's progress in her 12-step plan was "unsatisfactory." Mother had been attending counseling sessions at a treatment center but had also tested positive for "[benzodiazepines] and THC" earlier in March. Nonetheless, Limehouse testified that Mother was "making progress" and "actively participating" with DCFS. Mother was also previously engaged in inpatient services as part of her treatment but had recently been discharged and was recommended to begin outpatient services. On cross-examination, Limehouse agreed that Mother was "participating in a methadone clinic." At the conclusion of the hearing, the court ordered that it would retain its goal of having V.K. returned home within 12 months, although it acknowledged that Mother "ha[d] not made substantial progress" towards that goal since the last hearing.

¶ 18    On September 25, 2018, the court held the next permanency review hearing. The State noted that Mother completed "nearly all of her action steps [outlined in her service plan,] with only a few missed counseling sessions." The parties agreed to stipulate "to substantial progress[,] as well as reasonable efforts." Consequently, the court found that Mother had "made substantial progress toward the return home of [V.K.]," as well as "reasonable efforts to achieve the permanency goal." On February 26, 2019, the court made similar findings regarding Mother's "positive" progress.

¶ 19    On August 20, 2019, during another permanency hearing, the GAL argued that Mother had made "no reasonable efforts and no substantial progress" since the prior February in returning V.K. home. Mother conceded to having had a "positive screen for cocaine" in April 2019, and admitted that, in June 2019, she had been incarcerated. However, she pointed out that she had since returned to treatment and was "going to out-patient ever since." Mother further stressed that she was working, engaging in individual therapy, and was trying to "remain clean." Nonetheless, the

court found that she had not made significant progress or significant efforts towards reunification with V.K.

¶ 20     The case was continued several times to August 18, 2020, partly as a result of the ongoing COVID-19 pandemic. On that date, the State argued that Mother had not "made substantial progress towards the return home of [V.K.,] given that [Mother] has tested positive on a number of *** toxicology screens." Additionally, the State remarked that Mother was unemployed and "without suitable housing" for V.K. The State recommended that the court change its permanency goal to "substitute care pending court termination *** of parental rights." Lazda testified, confirming that Mother remained jobless, did not have a stable home, and tested positive for "methadone, [benzodiazepines], and opioids" in March 2020. Mother did not have a prescription for any opioids at that time but was prescribed methadone as part of her treatment. On re-direct examination, Lazda agreed that Mother's permanency goal should be changed "from return home with care pending to termination of parental rights."

¶ 21     Mother called Corey Hamilton, a counselor with Proviso-Leyden Counsel for Community Action (PLCCA), to testify. Hamilton testified that Mother saw him "as part of [her] methadone treatment, and agreed that, since February 18, 2020, Mother had "all clean screens with [him] except for once[, when] she had a false positive. Accordingly, Hamilton was able to deduce that Mother "was clean" between "October of 2019 and at least mid-February of 2020," excepting the methadone she used as part of her treatment and prescription benzodiazepines. On cross-examination, Hamilton further testified that he met with Mother "every day," and that she "comes to the clinic six days a week."

¶ 22     Mother testified that her difficulties finding stable housing were due to the ongoing pandemic. At the conclusion of the hearing, the court entered an order finding that "Mother ha[d]

not made substantial progress toward the return home of [V.K.]" and updated its permanency goal to "[substitute care] pending court determination on termination of parental rights." However, the August 18, 2020, order additionally specified that "[M]other ha[d] made reasonable efforts" to achieve "the permanency goal."

¶ 23     On September 15, 2020, the State filed its petition to terminate parental rights. On February 1, 2021, it filed its first amended petition to terminate parental rights.

¶ 24     On March 16, 2021, the court held another permanency review hearing. The State commented that Mother had missed visits with V.K. on numerous occasions since the last hearing and suggested that her lack of "effort to even see her daughter *** [was] evidence that the goal of substitute care, pending termination of parental rights [was] appropriate." Consequently, the State requested "that the case be set for a hearing on termination of parental rights." The GAL concurred with the State's request, noting that "[Mother] has not been in contact with DCFS." In turn, Mother requested that the court "consider changing the [permanency] goal back to return home within 12 months," and argued that she "ha[d] been clean for some time, even including the last permanency review hearing date." Mother also contended that, since the last hearing, she had found "a place to live." Concerning the missed visits, Mother informed the court that DCFS had never contacted her regarding any prospective visits with V.K., and that she had "tried to call DCFS and leave messages" concerning the same. Lazda rebutted Mother's assertions, suggesting that she had contacted Mother prior to the visits. The court found that Mother did not make reasonable efforts or progress towards the permanency goal and set a date for the hearing on the State's petition to terminate parental rights.

¶ 25     On April 14, 2021, the State filed its second amended petition to terminate parental rights, and, on June 22, 2021, it filed its third amended petition to terminate parental rights. In its latest

amended petition, the State argued that, on May 30, 2017, the circuit court held an adjudicatory hearing in which "a default finding against [Mother] was made of record," and that, on that date, V.K. "was adjudicated a NEGLECTED MINOR" pursuant to the Act. The petition detailed the July 11, 2017, dispositional hearing, in which "[t]he [c]ourt found [Mother] unfit or unable for some reason other than financial circumstances alone to care for, protect, train, or discipline [V.K.]" After briefly discussing the permanency review hearings that followed, the petition alleged that Mother "failed to make reasonable efforts to correct conditions which were the basis for the removal of [V.K.], or, that she alternatively "failed *** to make reasonable progress toward the return of the child to the parent" during three, separate nine month time periods: 1) from May 30, 2017, to February 28, 2018; 2) from August 20, 2019, to May 30, 2020; and 3) from May 30, 2020, to February 28, 2021.

¶ 26    On July 13, 2021, the court proceeded with the hearing on the State's petition to terminate parental rights. The State called Lazda, Keith Smith (a prior DCFS caseworker), and Limehouse as witnesses, who all testified as to Mother's performance in completing DCFS "service plan[s]" throughout the pendency of the case, which outlined "the overall goal[s] for the case, ranging from return home, independence, guardianship, and adoption." Their service plans also included "action steps," which were tasks that Mother needed to complete in ultimately reaching her "overall goal," which, for much of the case, involved returning V.K. home within 12 months. All three DCFS workers testified as to Mother's "unsatisfactory" ratings for various tasks throughout the applicable time periods referenced in the State's amended petition, including all of the tasks contained in her February 9, 2017, and February 2, 2020, service plans.

¶ 27    Mother was also rated as "unsatisfactory" in completion of several service plan "outcome goal[s]" or "desired outcomes," which were individual "goals" for various "problem area[s]"

Mother had, including goals to "lead a drug and alcohol[-]free life," achieve "overall mental health," participate in random urine drops," and to "attend a substance abuse assessment." The DCFS workers further testified that they found Mother's progress to be "unsatisfactory" for several different permanency review hearing periods throughout the case.

¶ 28    The State rested its case, and Mother moved for a directed finding, which the circuit court denied. Mother called Hamilton to testify. Hamilton described how, while working for PLCCA, he helped Mother eventually find housing with an agency called Housing Forward in "September or October of [20]20." Hamilton further testified that, between October 2019 and May 2021, Mother never failed a drug test. On cross-examination, Hamilton testified that he had "never received a service plan" for Mother while working for PLCCA. Hamilton agreed that, on August 6, 2020, he had sent a letter to Lazda "address[ing] that[,] in December of the prior year, [Mother] had some issues with some dirty drops." Hamilton further acknowledged that, in February 2020, Mother "was missing groups" as well as a "an appointment for housing." Hamilton also admitted that, in March 2020, "there was another dirty drop." However, Hamilton suggested that Mother's drug test "came back for [benzodiazepines]," and that Mother "was prescribed a medication" that caused the positive test result. Hamilton described certain "goals that he set for [Mother]," including decreasing her methadone dosages, taking any prescribed medications, "being more open and honest," and obtaining housing. When asked about Mother's progress in meeting these goals, Hamilton responded, "[Mother] has a therapist. She has a sponsor. She makes meetings. *** But, I mean, she's gotten—she's better. She's accomplished most of the goals that I set for her."

¶ 29    Following Hamilton's testimony, the parties made their arguments. Afterwards, the circuit court found that, between May 30, 2017, and February 28, 2018, Mother failed to make reasonable efforts to correct the conditions forming the basis of V.K.'s removal. The circuit court also found

that, in that same time period, Mother failed to make reasonable progress to have V.K. returned home. Finally, the court found that Mother similarly failed to make reasonable progress between August 20, 2019, and May 30, 2020. Upon these grounds, the circuit court ruled that Mother was unfit.

¶ 30    On August 2, 2021, the circuit court held its best interests hearing, in which the circuit court found that it was in V.K.'s best interests to terminate Mother's parental rights. On August 26, 2021, Mother filed her motion to reconsider termination of parental rights, which she amended on September 30, 2021. In her motion, Mother argued that, as a result of the court's failure to hold its adjudicatory hearing within 90 days of service, the court erred when it refused her request to dismiss the State's original neglect petition. Mother also argued that the State "failed to prove by clear and convincing evidence that [Mother] was unfit," or that, by a preponderance of the evidence, "it was in [V.K.'s] best interest [*sic*] that [Mother's] parental rights be terminated." On October 12, 2021, after the parties presented their arguments, the circuit court denied the motion. Mother appeals.

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, Mother makes three arguments: 1) that the circuit court erred in declining to dismiss the State's neglect petition as a result of its failure to hold the adjudicatory hearing within 90 days of service; 2) that the trial court applied an improper timeframe in determining whether Mother made reasonable efforts and progress towards reunification with V.K.; and 3) that the evidence was insufficient to find that Mother failed to make reasonable progress between August 20, 2019, and May 30, 2020. However, because the resolution of the first two arguments resolve the matter, we need not consider Mother's final argument.

¶ 33                        A. Timeliness of the Adjudicatory Hearing

¶ 34    First, because Mother did not appeal the circuit court's July 11, 2017, dispositional order making V.K. a ward of the court, she has forfeited any arguments concerning the timeliness of the May 30, 2017, adjudicatory hearing. "Appeals from final judgments entered in proceedings under the Juvenile Court Act, other than delinquent minor proceedings, are governed by the rules applicable to civil cases." *In re Leona W.*, 228 Ill. 2d 439, 456 (2008). Under those rules, "[t]he appellate court has jurisdiction to review only final judgments, except where a rule of the supreme court provides for an interlocutory appeal." *In re J.M.*, 151 Ill. App. 3d 1037, 1038 (1987). An adjudicatory order, in which the circuit court determines whether a minor is "abused, neglected, or dependent," is the first step leading to a dispositional order, which provides for the placement of the minor. *In re Ay. D.*, 2020 IL App (3d) 200056, ¶ 37. That being the case, adjudicatory orders are generally unappealable because they do not constitute final judgments. *J.M.*, 151 Ill. App. 3d at 1038. However, under the Act, a dispositional order "results in a final judgment for appeal purposes." *Id.* Accordingly, in order to appeal any aspect of an adjudicatory hearing, a party must file a notice of appeal within 30 days after the entry of the subsequent dispositional order. *Ay. D.*, 2020 IL App (3d) 200056, ¶ 37; *J.M.*, 151 Ill. App. 3d at 1038 (no jurisdiction for appellate court to consider propriety of adjudicatory order where no dispositional order was filed); *C.S., Jr.*, 294 Ill. App. 3d at 786-87 (in appeal from order terminating parental rights, appellate court had no jurisdiction over adjudicatory order where dispositional order was not appealed within 30 days); *In re J.J.*, 316 Ill. App. 3d 817, 825 ("claims pertaining to the adjudicatory hearing are appealable upon entry of the court's dispositional order, which is final").

¶ 35    Here, Mother argues that, pursuant to section 2-14 of the Act, the trial court erred when it refused Mother's and Wilkerson's request to dismiss the State's neglect petition at the May 23, 2017, hearing. Specifically, Mother contends that the circuit court "had no choice but to dismiss

[the State's] petition" once it became clear that the "period for adjudication had passed." As such, Mother suggests that the circuit court's May 30, 2017, order adjudicating V.K. as neglected was made "in error." Furthermore, because the circuit court did not dismiss the State's neglect petition, Mother argues that the May 30, 2017, adjudication order was a "deeply flawed ruling," which was "the lynchpin to all of the findings of unfitness in this case," meaning that the circuit court's later findings of unfitness "should be overturned in view of this infirmity."

¶ 36    We disagree. As we have provided above, Illinois law is clear that, in order to attack the propriety of an adjudicatory hearing on appeal, a party must first file a notice of an appeal within 30 days of the entry of the dispositional order. *Ay. D.*, 2020 IL App (3d) 200056, ¶ 37; *J.M.*, 151 Ill. App. 3d at 1038. Here, as acknowledged in Mother's brief, the circuit court issued its dispositional order on July 11, 2017. Therefore, in order to attack the timeliness of the adjudicatory hearing, Mother must have appealed the entry of the dispositional order within 30 days of that date. However, Mother's notice of appeal was filed over five years later, on October 21, 2021. Indeed, her notice of appeal does not even reference the dispositional order—it only provides the date of the circuit court's October 12, 2021, order terminating Mother's parental rights. Therefore, because Mother failed to timely appeal the circuit court's July 11, 2017, dispositional order, we are without jurisdiction to consider the validity of the circuit court's adjudicatory order, and Mother's arguments as to the adjudicatory hearing's timeliness are forfeited. *Ay. D.*, 2020 IL App (3d) 200056, ¶ 45. Consequently, Mother presents us with no basis to find that the court's subsequent orders are void as a result of the adjudicatory hearing, and Mother's argument as to that point necessarily fails. *C.S., Jr.*, 294 Ill. App. 3d at 786-787.

¶ 37                              B. Termination of Parental Rights

¶ 38    Next, while Mother argues that the circuit court utilized the wrong dates in determining

whether she made reasonable efforts or progress in the nine months since its neglect adjudication, her arguments to this point have also been forfeited. "A proceeding to involuntarily terminate parental rights is a drastic measure which determines whether, under our laws, a person should continue to hold the legal status of parent or have 'the entire bundle of parental rights, custodial and noncustodial,' forever removed." *In re D.D.*, 196 Ill. 2d 405, 416 (2001) (quoting *In re S.W.,* 315 Ill. App. 3d 1153, 1157 (2000)). Proceedings to terminate parental rights are initiated upon the filing of a petition to terminate parental rights. *Id.* Afterwards, the Act proscribes a two-part process for terminating parental rights. 705 ILCS 405/2-29 (West 2020). Pursuant to this process, the State must first show, by clear and convincing evidence, that a parent is unfit. *Id.* Afterwards, the State must prove, by a preponderance of the evidence, that "termination is in the child's best interests." *In re Tiffany M.*, 353 Ill. App. 3d 883, 891 (2004). "We defer to the trial court's factual findings and will not reverse the court's decision unless the findings are against the manifest weight of the evidence." *Id.*

¶ 39    Section 1(D) of the Adoption Act provides several grounds that may form the basis for a finding of parental unfitness. 750 ILCS 50/1(D) (West 2020). Two such grounds include:

> "Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period *following the adjudication of neglected or abused minor *** or (ii) to make reasonable* progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m) (West 2020) (emphasis added).

"When parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the

trial court." *Tiffany M.*, 353 Ill. App. 3d 883, 891.

¶ 40    Here, in her first argument attacking the circuit court's adjudication of unfitness, Mother contends that the trial court utilized an improper time frame in determining whether she made reasonable efforts or progress in the nine months since the circuit court's adjudication of neglect. While Mother's arguments as to this point are not altogether clear, she seems to reason that "the adjudication of [a] neglected or abused minor," as contemplated by section 1(D)(m) of the Adoption Act, corresponds to the date in which a trial court enters a dispositional order making a minor child a ward of the court, and not to the date in which a minor was adjudicated neglected. Therefore, because section 1(D)(m) focuses on "any 9-month period *following* the adjudication of neglected or abused minor," and because the circuit court entered its dispositional order on July 11, 2017, Mother reasons that it was improper for the court to begin its measure of Mother's progress or efforts earlier, from May 30, 2017, to February 28, 2018.   750 ILCS 50/1(D)(m) (emphasis added).

¶ 41    Mother's argument is once again forfeited. Our supreme court has found that a parent's challenge as to the applicable nine-month period measuring fitness is forfeited where that parent failed to raise the issue before the trial court. *In re D.F.*, 208 Ill. 2d 223, 238 (2003). Here, Mother never questioned the applicable nine-month period during any proceeding before the circuit court, or in her motion to reconsider termination of parental rights. That being the case, her argument is forfeited. *Id.*

¶ 42    Even if we were to consider Mother's argument, it would lack merit. As the State points out, Mother's argument runs contrary to our supreme court's precedent. In *D.F.,* 208 Ill. 2d at 238, the respondent argued that "the nine-month evaluation period begins on the date the circuit court enters its dispositional order." However, our supreme court disagreed, finding that section 1(D)(m)

was "clear and unambiguous" in providing that the date of a minor's adjudication of neglect, and not the date of a dispositional order, commences the nine-month evaluation period. *Id.* at 239-40. The respondent's argument in *D.F.* is identical to Mother's argument, as presented in her opening brief.

¶ 43    In her reply, Mother seemingly concedes as much, providing:

> "[Mother] agrees [with the State] that the date of adjudication is the triggering date for the nine[-]month period. The issue becomes whether the court order of May 30, 2017—an uncertain 'default' ruling poorly memorialized by court order—does not constitute the adjudication in this case."

Plainly put, this contention is untenable, and, in any event, Mother fails to support it with any authority. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Mother seemingly acknowledges that *D.F.* establishes that an adjudication of neglect—and not a dispositional order—begins the nine-month examination period. Despite the record's numerous references of May 30, 2017, being the date of the circuit court's adjudication of neglect, and Mother's acknowledgment of *D.F.*, Mother nonetheless maintains that the court's July 11, 2017, dispositional order commenced the applicable nine-month period in this case. Furthermore, if Mother's argument were to be interpreted as an assertion that certain infirmities relating to the May 30, 2017, adjudicatory order rendered it a nullity, again, Mother has forfeited any arguments concerning the propriety of that order by failing to timely appeal the circuit court's dispositional order. For all of these reasons, we reject Mother's arguments. Because Mother does not otherwise challenge the circuit court's findings pertaining to the nine-month period from May 30, 2017, to February 28, 2018, she has failed to show that the circuit court's findings as to this time period were against the manifest weight of the evidence. Accordingly, because Mother has not demonstrated that all of the grounds forming the basis of the

circuit court's unfitness finding were against the manifest weight of the evidence, we need not consider Mother's remaining arguments. *Tiffany M.*, 353 Ill. App. 3d at 891.

¶ 44                                    III. CONCLUSION

¶ 45    For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 46    Affirmed.