2023 IL App (5th) 220614-U

NO. 5-22-0614

NOTICE
Decision filed 01/18/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* J.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-JA-65 |
| | ) | |
| Jesse S., | ) | Honorable |
| | ) | Brett N. Olmstead, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's findings that respondent father was an unfit parent, and that termination of his parental rights was in the minor's best interest, were not against the manifest weight of the evidence.

¶ 2    Respondent, Jesse S., appeals from the judgment of the circuit court of Champaign County terminating his parental rights to his biological minor child, J.S. On appeal, Jesse S. argues that the court's findings that he was an unfit parent and that it was in J.S.'s best interest to terminate his parental rights were against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 3                                    I. Background

¶ 4      Jesse S. and Amber W.[1] had one child, J.S., born in August 2020. The Illinois Department of Children and Family Services (DCFS) took protective custody of J.S. shortly after his birth on August 5, 2020.

¶ 5      On August 6, 2020, the State filed a three-count petition for adjudication of neglect with regard to J.S. In count I, the State alleged that J.S. was neglected pursuant to section 2-3(1)(c) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(c) (West 2020)), because J.S. was born with a controlled substance in his blood, urine, or meconium. In counts II and III, the State alleged that J.S. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act (*id.* § 2-3(1)(b)), because J.S. was in an injurious environment when he resided with Amber W. (count II) and Jesse S. (count III) in that the environment exposed J.S. to substance abuse.

¶ 6      Also, on August 6, 2020, DCFS filed a shelter care report, which indicated that Amber W. tested positive for opiates at the time of J.S.'s birth. According to the report, a child protection advanced specialist interviewed Amber W. and Jesse S. on August 4, 2020. During the interview, Amber W. admitted that "she last used METH when she was 2 months pregnant" and "started again at 20 weeks using on and off." Amber W. also admitted that she used heroin two or three days before she gave birth to J.S. Jesse S. admitted that he used heroin five days prior to the interview and occasionally drank alcohol. Jesse S. also reported knowledge of Amber W.'s heroin use during the pregnancy, including her use several days before she gave birth to J.S.

¶ 7      Prior to the shelter care hearing on August 6, 2020, the circuit court entered an order appointing a guardian *ad litem* (GAL) for J.S. Both Amber W. and Jesse S. appeared at the shelter care hearing via telephone with appointed counsel. Following the hearing, the court entered a

_____

[1]Although Amber W.'s parental rights were also terminated, she is not a party to this appeal. Accordingly, we recite only those facts necessary to our disposition of the appeal.

2

temporary custody and admonition order, finding the shelter care report sufficient to establish probable cause that J.S. was neglected and placing temporary custody of J.S. with DCFS. According to the order, both parents stipulated to the shelter care report for the purpose of probable cause and agreed to temporary custody.

¶ 8     On September 17, 2020,[2] DCFS, in coordination with Center for Youth and Family Solutions (CYFS), prepared a family service plan for both parents. The service plan indicated that the desired outcome for Jesse S. was to "become sober and learn to live and maintain a sober lifestyle free of drugs so that he may live and parent sober and safely." According to the service plan, Jesse S. was required to perform the following tasks: complete an assessment for substance abuse treatment and follow any recommendations of the assessment; refrain from using all illicit substances and complete random drug screens; complete a parenting education course; complete a domestic violence education course or counseling; maintain employment and housing; allow the assigned caseworker into his home on a monthly basis; engage in individual counseling; and engage in weekly supervised visitation with J.S.

¶ 9     On October 22, 2020, following an adjudicatory hearing, the circuit court entered an adjudicatory order. In the order, the court dismissed count I of the petition. The court found that Amber W. admitted and stipulated to count II of the petition, and that Jesse S. admitted and stipulated to count III of the petition. The court found that both parents stipulated to the shelter care report as the factual basis, and that the facts set forth in the report were legally sufficient to support findings as to counts II and III.

---

[2]The service plan from September 17, 2020, is not included in the record on appeal. These facts come from a service plan dated January 27, 2022, which referenced the service plan from September 17, 2020.

3

¶ 10    On November 16, 2020, Elsa Bielser, a foster care caseworker from CYFS, filed a dispositional report with the circuit court. Bielser noted in the report that both parents struggled with severe substance abuse issues. Jesse S. initially indicated that he did not want to be an active parent but later stated his commitment to engaging in the case and attempting to stay sober for J.S. Bielser noted that Jesse S. was "last arrested on 10/08/19 for Domestic Battery presumably against [Amber W.]" Jesse S. participated in weekly supervised visitation with J.S., during which he demonstrated his ability to appropriately care for and bond with J.S. According to the report, Jesse S. had not yet engaged in substance abuse treatment. Jesse S. was scheduled for a substance abuse assessment at Rosecrance on November 17, 2020. Jesse S. failed to appear for two drug screens, tested positive for opiates on October 9, 2020, and tested negative for all substances on the remaining screens for the reporting period. At the time of the report, Jesse S. remained on a waitlist for individual counseling. Bielser made no notation regarding Jesse S.'s progress on domestic violence counseling. Bielser recommended a goal of return home within 12 months.

¶ 11    On December 17, 2020, following a dispositional hearing, the circuit court entered a dispositional order. The court found both parents unable, for reasons other than financial circumstances alone, to care for, protect, train, or discipline J.S., and that the health, safety, and best interest of J.S. would be jeopardized if J.S. were in the custody of his parents. Thus, the court adjudicated J.S. neglected and placed him in the custody and guardianship of DCFS.

¶ 12    On March 15, 2021, CYFS caseworker Bielser filed a permanency hearing report with the circuit court. The report indicated that Jesse S. made satisfactory progress and reasonable efforts toward the return home goal. According to the report, Jesse S. regularly attended domestic violence counseling. In addition, he completed a substance abuse assessment and began intensive outpatient treatment in January 2021. Jesse S.'s drug screen results were negative for all substances from

4

December 15, 2020, to March 5, 2021. Jesse S. successfully completed parenting courses in February 2021. Jesse S. had not completed individual counseling, but Bielser indicated that she would resubmit a referral for counseling. Bielser recommended a permanency goal of return home within 12 months.

¶ 13   On March 18, 2021, the circuit court entered a permanency order, finding that Jesse S. made reasonable and substantial progress, as well as reasonable efforts toward returning J.S. home. The court found the appropriate permanency goal was return home within 12 months.

¶ 14   On June 24, 2021, CYFS caseworker Bielser filed a permanency hearing report with the circuit court. Bielser indicated that Jesse S. made reasonable efforts but not satisfactory progress toward the return home goal. Bielser noted that Jesse S. was discharged from domestic violence counseling due to two unexcused absences, but he reengaged in domestic violence counseling in June 2021. Jesse S. continued to engage in intensive outpatient treatment at Rosecrance, but Bielser was unable to obtain a recent progress report from his counselor. Bielser notified Jesse S.'s counselor that Jesse S. recently relapsed, as demonstrated by his recent positive drug screen for opiates on June 10, 2021. Bielser noted that Jesse S. tested negative for all substances on drug screens from March 11, 2021, to June 1, 2021. Bielser recommended that the permanency goal remain return home within 12 months.

¶ 15   On July 1, 2021, the circuit court entered a permanency order. The court found that Jesse S. made neither reasonable and substantial progress nor reasonable efforts toward returning J.S. home. The court found that the appropriate permanency goal remained return home within 12 months.

¶ 16   On September 22, 2021, CYFS caseworker Bielser filed a permanency hearing report with the circuit court. The report indicated that Jesse S. made reasonable efforts but not satisfactory

5

progress toward the return home goal. Bielser indicated that Jesse S. had completed three domestic violence counseling sessions as of June 2021, but Bielser was unable to obtain an updated report from his counselor. In addition, Bielser was unable to obtain an updated report regarding Jesse S.'s progress in substance abuse treatment. Jesse S. openly admitted to Bielser that he continued to use heroin, and he failed to appear for all drug screens scheduled from July 9, 2021, to September 15, 2021. Bielser recommended that the goal remain return home within 12 months.

¶ 17     On October 7, 2021, the circuit court entered a permanency order. The court found that Jesse S. made neither reasonable and substantial progress nor reasonable efforts toward returning J.S. home. The court found that the appropriate permanency goal remained return home within 12 months.

¶ 18     On January 19, 2022, CYFS caseworker Janessa Hays filed a permanency hearing report with the circuit court. Hays indicated that Jesse S. made reasonable efforts but not satisfactory progress toward the return home goal. Hays noted that Jesse S. remained employed full time at a mattress factory. According to the report, Jesse S. was arrested on September 23, 2021, for controlled substances trafficking. Hays noted that Jesse S. entered Gateway Treatment Center for inpatient substance abuse treatment on November 9, 2021, and that he completed treatment on December 17, 2021. Following his completion of treatment, he resided at Jesus is the Way Prison Ministry. Due to his inpatient substance abuse treatment and restrictions at Jesus is the Way, Jesse S. stopped attending domestic violence counseling. Hays sent paperwork to Jesus is the Way in an effort to assist Jesse S. in attending the recommended domestic violence counseling. Jesse S. contacted his assigned substance abuse counselor on January 13, 2022, and the counselor advised Jesse S. that he needed an updated referral and an assessment. Hays planned to complete the updated referral and assessment for Jesse S. Hays noted that Jesse S. openly admitted to heroin

use, and that he missed multiple drug screens from November 5, 2021, to January 10, 2022. According to Hays, CYFS provided Jesse S. with transportation to complete the drug screens. Jesse S. tested negative for all substances on December 21, 2021, and January 6, 2022. Results remained pending for the drug screen taken on January 10, 2022. Hays recommended that the permanency goal remain return home within 12 months.

¶ 19 On January 27, 2022, the circuit court entered a permanency order. The court found that Jesse S. made reasonable efforts but not reasonable and substantial progress toward returning J.S. home. The court found that the appropriate permanency goal remained return home within 12 months.

¶ 20 On April 20, 2022, CYFS caseworker Hays filed a permanency hearing report with the circuit court. Hays indicated that Jesse S. made reasonable efforts but not satisfactory progress toward the return home goal. Jesse S. advised Hays that he received a disciplinary action from Jesus is the Way for relapsing on heroin on December 25, 2021. Jesse S. further advised that he was discharged from Jesus is the Way for drinking alcohol on February 17, 2022. Jesse S. completed a substance abuse assessment at Rosecrance on February 28, 2022, but he was not referred for services at that time. Jesse S. reengaged in domestic violence counseling on March 17, 2022, and he attended three of four sessions as of April 7, 2022. According to the report, Jesse S. was unemployed and looking for work as of April 12, 2022. Jesse S. indicated that he was injured at work and took a Xanax a week after his work injury. Hays advised Jesse S. to reach out to Rosecrance regarding his use of Xanax. Jesse S. informed Hays that he was no longer able to stay at his aunt and uncle's house due to him "not following the rules that were set." Jesse S. moved into his cousin's residence, where he overdosed on heroin on April 12, 2022. At the time of the report, Jesse S. resided with a narcotics anonymous sponsor, but he had not released the name or

address to Hays. Jesse S.'s drug screens were negative from January 10, 2022, to March 16, 2022. Jesse S. tested positive for benzodiazepines and opiates on March 21, 2022, tested negative for all substances on March 31, 2022, tested positive for opiates on April 5, 2022, and failed to appear for a drug screen on April 11, 2022. Hays recommended that the permanency goal remain return home in 12 months.

¶ 21    On April 28, 2022,[3] the State filed a three-count motion seeking a finding of unfitness and termination of the parental rights of Amber W. and Jesse S. In count I, the State alleged that both parents were unfit within the meaning of section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2020)), because they failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child during any nine-month period following the adjudication of neglect. In count II, the State alleged that both parents were unfit within the meaning of section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)), because they failed to make reasonable progress toward the return home of the minor during any nine-month period following the adjudication of neglect. The State identified the relevant nine-month period for counts I and II as the time period from July 28, 2021, to April 28, 2022. In count III, the State alleged that both parents were unfit within the meaning of section 1(D)(b) of the Adoption Act (*id.* § 1(D)(b)), because they failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minor.

¶ 22    Also, on April 28, 2022, the circuit court entered a permanency order. The court made no findings regarding the efforts or progress of either parent due to the State's motion to terminate.

_____

[3]Also, on April 28, 2022, the State filed a first amended petition for adjudication of neglect. It appears the State repeated the same allegations of neglect as the original petition but clarified that Jesse S. was the legal father.

However, the court found that the appropriate permanency goal remained return home within 12 months.

¶ 23    On August 19, 2022, the circuit court held a fitness hearing. The State called Hays, a case supervisor at CYFS, to testify at the hearing. Hays testified that she became the assigned caseworker to J.S.'s case in September 2021 and remained the assigned caseworker until April 2022. In April 2022, Hays became a supervisor but continued working on J.S.'s case. Hays maintained regular contact with Jesse S. throughout her involvement in the case. In addition to visitation with J.S., Jesse S. was required to complete parenting classes, domestic violence counseling, individual counseling, substance abuse treatment, and drug screens. Jesse S. completed the required parenting courses prior to Hays's involvement in the case, but he had not completed any other recommended services. Jesse S. advised Hays that he began domestic violence counseling and substance abuse counseling, but that he had not yet successfully completed those services. Jesse S. admitted to Hays that he suffered from an active addiction in September 2021. At the time of the hearing, Jesse S. had not yet completed domestic violence counseling, although he reengaged in April 2022.

¶ 24    Hays testified that Jesse S. was not engaged in the recommended substance abuse treatment when she became involved in the case in September 2021. He began inpatient treatment at Gateway in November 2021, which he successfully completed. Following his successful completion, Jesse S. was discharged and released to Jesus is the Way—a halfway house for men. Jesse S. was subsequently discharged from the program due to substance abuse violations. Hays explained that Jesse S. relapsed on heroin on December 25, 2021, and he was later discharged for using alcohol. Jesse S. admitted to Hays that he again relapsed on heroin in April 2022. Hays explained that Jesse S. was required to undergo substance abuse screens throughout the entirety of the case. Jesse S.

9

was expected to undergo four screens per month. While Jesse S. was cooperative throughout the relevant time period, he did not appear for every scheduled drug screen. Hays testified that Jesse S. "was very sporadic and some months were missed." According to Hays, Jesse S. missed more drug screens than he attended during the relevant nine-month time period. When Hays asked Jesse S. about his missed drug screens, Jesse S. stated that he had transportation issues or that he relapsed.

¶ 25    Hays testified that Jesse S. was required to attend weekly supervised visitation with J.S., despite his active addiction. Jesse S. consistently attended the weekly visitation except for the time he was engaged in rehab at Gateway, which caused him to miss several visits. Hays observed multiple visits between Jesse S. and J.S., and she never had concerns that Jesse S. was under the influence of drugs. Jesse S. engaged appropriately with J.S. However, Hays never considered allowing Jesse S. to have unsupervised visitation with J.S. because of his drug relapses and his failure to complete domestic violence counseling.

¶ 26    Hays testified that Jesse S. did not consistently engage in domestic violence counseling during the relevant time period. Jesse S. also failed to complete individual counseling. Hays explained that Jesse S. was placed on a waitlist for individual counseling. Jesse S. advised Hays that he was unable to contact the counselor, Stephanie Beard. However, Beard advised Hays that she was unable to contact Jesse S. Hays believed Beard over Jesse S.

¶ 27    On cross-examination, Hays testified that Jesse S. began substance abuse treatment at Gateway in November 2021 and successfully completed the program on December 17, 2021. Hays clarified that Jesse S. relapsed on heroin on December 25, 2021, and that he was discharged from Jesus is the Way for using alcohol in February 2021.

¶ 28    Also, on cross-examination, Hays testified that Jesse S. was engaged in domestic violence counseling at the time of the hearing. Hays explained that Jesse S. began the domestic violence courses in late June 2022 and remained consistent in his attendance. Hays agreed that Jesse S. remained in constant contact with her and was honest about his relapses throughout the entirety of the case. Jesse S. returned to inpatient care at Rosecrance for his substance abuse issues in May 2022. Jesse S. successfully completed the program at Rosecrance and resided in a recovery home provided through Rosecrance. Hays agreed that Jesse S. and J.S. shared a bond, explaining that J.S. became upset when Jesse S. went to the bathroom during a visit and stopped crying when Jesse S. returned. Jesse S. and J.S. played and interacted during each visit. J.S. called Jesse S. "daddy." Jesse S. only missed five visits with J.S. outside of the time he was in substance abuse treatment. Jesse S. did not need much direction during visits. During Hays's involvement in the case, Jesse S. relapsed in October 2021, December 2021, and April 2022. Hays believed that Jesse S. was more committed to maintain sobriety at the time of the hearing than he had been in the past. Jesse S. was not currently engaged in individual counseling. Hays believed she would have to put in an additional referral for counseling because of the length of time that had passed since the first referral.

¶ 29    On re-direct, Hays clarified that, following a welfare check, Jesse S. was hospitalized for heroin use in October 2021. Jesse S. also relapsed on heroin in December 2021 and alcohol in February 2022. Jesse S. next relapsed in April 2022, when he overdosed on heroin. Jesse S. began living with his aunt and uncle following his discharge from Jesus is the Way, but he was kicked out due to his heroin use. Jesse S. moved in with his cousin and remained there until his overdose in April 2022. Jesse S. entered a substance abuse program at Rosecrance in May 2022 and was

11

successfully released from the program in June 2022. Jesse S. maintained three months of sobriety since his release. Jesse S. did not request an additional referral for individual counseling.

¶ 30    On re-cross, Hays testified that Jesse S. tested positive for various substances on March 21, 2022, and April 5, 2022. Jesse S. admitted to Hays that he used Xanax laced with morphine without a prescription from a medical provider.

¶ 31    Also, on re-cross, Hays testified that she gave Jesse S.'s assigned counselor for individual counseling all phone numbers she had for Jesse S. Jesse S.'s assigned counselor reached out to Hays in April or May 2022 and advised that she was unable to reach Jesse S. on the phone numbers Hays provided.

¶ 32    At the State's request, the circuit court took judicial notice of a charging document and sentencing order, both of which indicated that Jesse S. pled guilty to unlawful possession of a controlled substance with intent to deliver in September 2021 and received a sentence of 30 months' probation. The court also took judicial notice of all prior orders entered in the case. The State rested, and Jesse S. did not present any evidence at the hearing.

¶ 33    At the close of evidence, the State requested that the circuit court find in its favor as to counts I and II of the motion seeking a finding of unfitness, conceding that it had not proven count III as to Jesse S. The State believed that Jesse S. demonstrated a consistent interest, concern, and responsibility as to J.S. throughout the pendency of the proceedings. However, the State argued that it clearly proved counts I and II as to Jesse S., stating that all of Jesse S.'s efforts and progress occurred after the relevant nine-month time period. The GAL recommended that the court find the State clearly proved counts II and III against Jesse S.

¶ 34    After considering the parties' arguments, the circuit court found that the State failed to prove counts I and III against Jesse S. However, the court found that the State proved, by clear and

12

convincing evidence, count II, in that it presented evidence showing that Jesse S. failed to make reasonable progress toward J.S.'s return home from July 28, 2021, to April 28, 2022. In so finding, the court noted that, as of April 28, 2022, there was no point in the near future where J.S. could return to Jesse S.'s custody. The court also found Amber W. unfit. The court entered a written order to that effect following the fitness hearing.

¶ 35    On September 6, 2022, CYFS supervisor Hays filed a best interest report with the circuit court. Hays noted that J.S. resided in his current foster placement since May 9, 2022. Hays noted that J.S. previously resided with the same foster family from December 2, 2020, to June 24, 2021, but was removed from the home due to Amber W.'s harassment of the foster parents. The foster parents remained in contact with Hays regarding the possibility of J.S. returning to their care. At his foster home, J.S. had his own bedroom with a crib, dresser, rocking chair, and toys. J.S. appeared comfortable with his foster parents and was able to identify their home as his home. J.S. attended daycare Monday through Friday from 7:30 a.m. to 3 p.m. The foster parents intended to provide for J.S.'s educational needs at the appropriate age. J.S. referred to his foster parents as "mommy" and "daddy." J.S. also appeared bonded with the foster parents' daughter, whom he called "sissy." J.S. also developed an attachment with other family members of his foster parents who regularly visited the family. According to Hays, J.S. displayed a "visible sense of attachment and belonging to the foster parents." Hays indicated that all of J.S.'s needs were met in the home and that his foster parents were "extremely attentive" to him. Hays also indicated that the foster parents desired "to provide permanency through adoption for [J.S.] and to continue to care for [J.S.] throughout his life." Hays further noted that the foster parents "consistently and continually provided for [J.S.'s] well-being needs, medical needs, educational and developmental needs, and all other aspects of [J.S.'s] life as he continue[d] to grow and thrive." Thus, Hays recommended

13

that the parental rights of both parents be terminated, DCFS maintain custody of J.S., and the permanency goal be changed to adoption for J.S.

¶ 36    On September 14, 2022, the circuit court entered a permanency order changing the permanency goal to adoption. The same day, the matter proceeded to a best interest hearing. At the outset of the hearing, the court indicated that it received and reviewed the best interest report filed on September 6, 2022. The court admitted into evidence a "late August letter from Rosecrance indicating [Jesse S.'s] success in treatment at that point." The parties did not present any additional evidence at the hearing.

¶ 37    When the circuit court asked for a recommendation from the State, the State indicated that Amber W. "checked out" of the case and that her parental rights should clearly be terminated. The State noted that "the tougher argument" pertained to Jesse S. The State noted that Jesse S. was currently "doing great" and had maintained 3½ months of sobriety. The State further noted that Jesse S. was cooperative and engaged in all recommended services to maintain his sobriety. Despite this, the State noted that the case had remained open for two years and that "the theme of this case has been [Jesse S.'s] ups and downs." The State noted that Jesse S. had many relapses, including a relapse the previous spring. The State indicated that "the pattern established in this case doesn't give us the certainty we need for [J.S.'s] sake and to serve [J.S.'s] best interests." Lastly, the State believed, based on the best interest factors, that it was in J.S.'s best interests that Jesse S.'s parental rights be terminated as well.

¶ 38    The GAL agreed with the State's recommendation to terminate Amber W.'s parental rights, given her lack of participation in the case. With regard to Jesse S., the GAL noted that Jesse S. remained in contact with the agency throughout the entirety of the case. However, the GAL explained that the focus of the hearing was the best interest of J.S. The GAL noted that, in his

14

current placement, J.S. developed a routine with consistent parent figures. According to the GAL, Jesse S. was unable to provide that sense of security to J.S. for over two years due to his addiction. The GAL acknowledged that Jesse S. made progress in treating his substance abuse issues but, in the GAL's opinion, the door closed for Jesse S. to be J.S.'s parent. The GAL acknowledged there was a gap in time where J.S. did not reside with his current foster parents, but the GAL did not believe the gap affected J.S.'s bond with the foster family and his sense of security in the home. The GAL went on to state:

> "He calls them mommy and daddy. He goes to church with them. He has a community that he has started to build even [at] just two years old. He's got a community. He knows they go to church together. He knows where they're going when they go there. I mean, that's—that's his permanency. That's where he lives. *** That's where he—he loves and that's where he is loved, and that—that's part of the criteria that the Court will be considering, is that sense of attachment.

> And as far as a child needing permanence, for Pete's sake if there ever was a child that needed some permanence it's [J.S.] and he's found it in my opinion. That's where he feels that he permanently belongs. He already feels like that. He lives there. That's his house."

Thus, although the GAL recognized that Jesse S. made some progress on his substance abuse issues, the GAL recommended that the circuit court terminate his parental rights to J.S.

¶ 39    Jesse S.'s attorney argued that J.S. was "just barely two years old" and that there was inconsistency in J.S.'s placement, making it unlikely that J.S. was so attached to his foster family that he would suffer negative consequences if Jesse S.'s parental rights were not terminated. Jesse S.'s attorney argued that J.S. also called Jesse S. "daddy." Jesse S.'s attorney further noted that

Jesse S. was consistent with his visits with J.S. unless he was in inpatient treatment, and that there were never any concerns that Jesse S. was under the influence during the visits. Jesse S.'s attorney pointed out that "relapsing [was] part of the path toward sobriety" and that Jesse S. was more committed to maintaining sobriety than he had been in the past. Jesse S.'s attorney further argued as follows:

"He has relapsed and he has gone through the steps to make sure as much as he can that he is putting the pieces in place to avoid that happening again. Would it have been nice if it happened before the motion to terminate parental rights was filed, sure, but that's not where we are. But [J.S.] knows this man. This isn't a stranger to him. This is his daddy, and I'm asking this Court to make an exception based on the exceptional facts of this case and to find that it is not in his best interests to terminate [Jesse S.'s] parental rights today."

¶ 40    Following the parties' arguments, the circuit court indicated that it reviewed "the best interests materials, the exhibit admitted, the representations and recommendations of counsel," along with the evidence for adjudication of the motion and all orders entered in the case. The court stated that, unlike the fitness hearing focused on the parent's conduct, the best interests hearing focused on the child's best interests. The court noted that it was required to consider various statutory factors in making the best interest determination.

¶ 41    With regard to J.S.'s current foster placement, the circuit court noted that J.S. was in a "wonderful home" that was a permanent option. The court noted that if it terminated both parents' parental rights, J.S.'s foster parents were able and willing to adopt J.S. The court noted that all of J.S.'s needs were met in the home, including food, shelter, health, and clothing.

¶ 42    With regard to Jesse S., the circuit court stated that he was not currently in a position to provide for the physical safety and welfare of J.S., although he was "on a path to get there." The

16

court acknowledged that Jesse S. was part of J.S.'s life, and that J.S. recognized him. However, the court noted that Jesse S. never had custody of J.S., and that J.S. remained in temporary custody since his birth. The court noted that J.S. was initially placed in the custody of his current foster parents in December 2020 but was removed in June 2021 due to Amber W.'s harassing conduct. J.S. resided in a different home until he returned to his current foster parents in May 2022. The court noted that J.S. developed an identity, ties, and attachments in his current foster placement, which extended to his home, church, daycare, friends, and foster family. The court recognized that Jesse S. maintained a relationship with J.S. through regular visitation, but the court described the home Jesse S. could provide J.S. as "a yo-yo" with repeated ups and downs. The court acknowledged Jesse S.'s recent progress towards maintaining sobriety but found there was no point on the near horizon where J.S. could return to Jesse S. Thus, the court found, by clear and convincing evidence, that it was in the best interest of J.S. that Jesse S.'s parental rights be terminated. The court also found it in J.S.'s best interest that Amber W.'s parental rights be terminated.

¶ 43    Following the hearing held on September 14, 2022, the circuit court entered a written order terminating the parental rights of both Jesse S. and Amber W. Jesse S. filed a timely appeal.

¶ 44                                  II. Analysis

¶ 45    On appeal, Jesse S. challenges the circuit court's judgment terminating his parental rights to J.S., arguing that the court erred by finding him an unfit parent and by finding it in the best interest of J.S. to terminate his parental rights. For the reasons that follow, we disagree.

¶ 46    "[T]ermination of parental rights is an extraordinarily serious matter." *In re M.F.*, 304 Ill. App. 3d 236, 238 (1999). "The termination of parental rights constitutes a permanent and complete severance of the parent-child relationship." *In re C.N.*, 196 Ill. 2d 181, 208 (2001). The Juvenile

17

Court Act establishes a two-step process for the involuntary termination of parental rights. See 705 ILCS 405/2-29(2) (West 2020). First, the State must prove, by clear and convincing evidence, that the parent is an unfit person as defined by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004). Section 1(D) sets forth multiple grounds "under which a parent may be found unfit, any of which standing alone may support" a finding of unfitness. *Id.* If the circuit court finds the parent unfit under one of the enumerated grounds, the court must then determine whether it is the child's best interest that parental rights be terminated. 705 ILCS 405/2-29(2) (West 2020).

¶ 47                                    A. Parental Unfitness

¶ 48     Jesse S. first argues that the circuit court erred by finding him an unfit parent. Specifically, Jesse S. argues that the court's finding that he failed to make reasonable progress toward J.S.'s return during the time period from July 28, 2021, to April 28, 2022 (750 ILCS 50/1(D)(m)(ii) (West 2020)), was against the manifest weight of the evidence. We disagree.

¶ 49     As noted, in the first step, the State must prove, by clear and convincing evidence, that the parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). 705 ILCS 405/2-29(2), (4) (West 2020). Section 1(D) of the Adoption Act sets forth multiple grounds for unfitness. 750 ILCS 50/1(D) (West 2020). A finding of parental unfitness will not be disturbed unless it is against the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 50     One ground of unfitness is the failure by a parent "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected

18

or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act." 750 ILCS 50/1(D)(m)(ii) (West 2020). "Reasonable progress is an objective standard, focusing on the amount of progress toward the goal of reunification one can reasonably expect under the circumstances." (Emphasis omitted.) *In re C.M.*, 305 Ill. App. 3d 154, 164 (1999). Reasonable progress requires, at a minimum, measurable or demonstrable movement toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006).

¶ 51　　Although DCFS service plans are an integral part of the statutory scheme, our supreme court has rejected the view that the sole measurement of parental progress is the parent's compliance with service plans. *In re C.N.*, 196 Ill. 2d at 214-15. Instead, the supreme court ruled that

> "the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *Id.* at 216-17.

Moreover, the Fourth District has repeatedly stated that "a court is duty bound to ensure that serious parental deficiencies of whatever nature have been corrected before the court permits one of its wards to be returned to that parent's custody." *In re L.L.S.*, 218 Ill. App. 3d 444, 464 (1991); *In re C.M.*, 305 Ill. App. 3d at 164; *In re C.S.*, 294 Ill. App. 3d 780, 790 (1998).

¶ 52　　Here, the evidence demonstrated that the condition which gave rise to the removal of J.S. from Jesse S.'s care was Jesse S.'s substance abuse. The service plan required Jesse S. to undergo

19

substance abuse treatment, refrain from using all substances, and complete random drug screens. The evidence showed that, during the relevant time period, Jesse S. pled guilty to unlawful possession of a controlled substance with intent to deliver. While the evidence demonstrated that Jesse S. began, and even completed, substance abuse treatment on several occasions, Hays testified that Jesse S. relapsed on heroin three times during the relevant time period. Specifically, he relapsed in October 2021, December 2021, and April 2022. Hays also testified that Jesus is the Way discharged Jesse S. for using alcohol in February 2022. In addition, Hays testified that Jesse S. missed more scheduled drug screens than he attended during the relevant time period. Jesse S. also had several positive drug screens and admitted to using Xanax during the relevant time period. Although Jesse S. subsequently reentered inpatient substance abuse treatment, successfully completed inpatient treatment, and maintained sobriety for a period following his successful completion of treatment, such actions took place outside of the relevant nine-month time period.

¶ 53    The service plan additionally required Jesse S. to complete domestic violence counseling, parenting courses, individual counseling, and weekly supervised visitation with J.S. Hays testified that Jesse S. completed the recommended parenting course prior to her involvement in the case, and that Jesse S. engaged in weekly visitation with J.S. without issue. Hays testified that Jesse S. began a domestic violence course but never completed the task during the relevant time period. Hays also testified that Jesse S. failed to engage in individual counseling during the relevant time period.

¶ 54    In sum, the record reveals that, although Jesse S. actively worked to complete several tasks set forth in the service plan from July 28, 2021, to April 28, 2022, he continued to abuse substances—the condition which gave rise to the removal of J.S.—during the same time period. Thus, the evidence supported the circuit court's finding that Jesse S. failed to make reasonable

20

progress toward the return home goal. Accordingly, we cannot say that the court's finding that Jesse S. was unfit, as defined in section 1(D)(m)(ii) of the Adoption Act, was against the manifest weight of the evidence.

¶ 55                                    B. Best Interest Determination

¶ 56     Jesse S. next argues that the circuit court's determination that it was in the best interest of J.S. to terminate his parental rights was against the manifest weight of the evidence. We disagree.

¶ 57     As noted, if the circuit court finds the parent unfit, the matter proceeds to a second hearing, where the State must prove, by a preponderance of the evidence, that it is in the child's "best interests" that parental rights be terminated. 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d 347, 366 (2004). During the second step of the process, the focus of the court's scrutiny shifts from the rights of the parents to the best interests of the child. *D.T.*, 212 Ill. 2d at 365. The court's best interest determination will be reversed only if it is against the manifest weight of the evidence. *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 58     Section 1-3 of the Juvenile Court Act lists the "best interests" factors that should be considered by the trial court when making a "best interests" determination. 705 ILCS 405/1-3(4.05) (West 2020). Specifically, the circuit court must consider the following factors in the context of the child's age and developmental needs: (1) the physical safety and welfare of the child, (2) the development of the child's identity, (3) the child's background and ties, (4) the child's sense of attachments, (5) the child's wishes, (6) the child's community ties, (7) the child's need for permanence, (8) the uniqueness of every family and child, (9) the risks attendant to entering and being in substitute care, and (10) the preferences of the persons available to care for the child. *Id.*

¶ 59    Here, the circuit court considered the best interest report and best interest factors in finding it in J.S.'s best interest that Jesse S.'s parental rights be terminated. The best interest report showed that J.S. resided in a home with foster parents from December 2, 2020, to June 24, 2021, but was removed from the home due to Amber W.'s harassment of the foster parents. J.S. returned to the home on June 9, 2022, and he remained in the home at the time of the best interest hearing. J.S. appeared very bonded with his foster parents, and he referred to them as "mommy" and "daddy." He also appeared bonded with the family of his foster parents. The evidence demonstrated that J.S.'s foster parents provided him with a loving and caring environment. All of J.S.'s needs were met in the foster home, where he had his own room, crib, and toys. J.S. also attended daycare and church in his current placement. The best interest report indicated that the foster parents "consistently and continually provided for [J.S.'s] well-being needs, medical needs, educational and developmental needs, and all other aspects of [J.S.'s] life as he continue[d] to grow and thrive." While there was evidence that J.S. bonded with Jesse S., the evidence indicated that J.S. needed permanency. J.S.'s foster parents expressed willingness to adopt J.S. and provide consistent care for him throughout his life. Based on the evidence presented, we conclude that the court's determination that it was in J.S.'s best interest to terminate Jesse S.'s parental rights was not against the manifest weight of the evidence.

¶ 60                                    III. Conclusion

¶ 61    For the reasons stated, we affirm the circuit court's judgment terminating the parental rights of Jesse S.


¶ 62    Affirmed.